# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**ENVIROANALYTICS**
**GROUP LLC,** *et al.,*                    *

      **Plaintiffs,**                                    *

      **v.**                                              *          **Civ. No. JKB-24-2970**

                                                  *

**AXIS SURPLUS INSURANCE**
**COMPANY,** *et al.,*                       *

      **Defendants.**                                    *

  *    *    *    *    *    *    *    *    *    *    *    *

## <u>MEMORANDUM</u>*

---

\* The original version of this Memorandum was entered on May 13, 2025, and docketed under seal the next day. (ECF No. 35.) The order effectuating the May 13 Memorandum was likewise entered on May 13 and docketed—although not under seal—on May 14. (ECF No. 36.)

    The parties have not, as of May 22, 2025, responded to the Court's invitation to continue to seal the May 13 Memorandum and to publish a narrowly redacted version for public access. (*See* ECF No. 36 at 2.) As a result, this Memorandum is docketed as an unsealed version of the earlier one. Except for this cover page, this Memorandum is in all respects identical to the May 13 Memorandum.

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 3

II.   BACKGROUND .................................................................................................. 3

    A.   Factual Background ...................................................................................... 3

    B.   Procedural History ........................................................................................ 8

III.  LEGAL STANDARD ......................................................................................... 9

IV.   ANALYSIS .......................................................................................................... 9

    A.   All Requests for Declaratory Relief Will Be Dismissed Without Prejudice as Against Both Insurers ................................................................................. 10

    B.   Industrial Demolition's Claims Against Nautilus Will Be Dismissed. .......................... 13

        1.   Choice-of-Law Rules for Contracts Without a Choice-of-Law Clause. ................. 14

        2.   Missouri Law Governs Industrial Demolition's Remaining Claims Against Nautilus. ................................................................................................. 15

        3.   Under Missouri Law, Nautilus Owed No Duties to Industrial Demolition in the Underlying Litigation ......................................................................... 17

    C.   EnviroAnalytics' Bad-Faith & Vexatious-Refusal Claims Against AXIS Will Be Dismissed. ................................................................................................. 36

        1.   Choice-of-Law Rules for Contracts with a Choice-of-Law Clause. ........................ 36

        2.   New York Law Governs EnviroAnalytics' Remaining Claims Against AXIS. ....... 39

        3.   Under New York Law, EnviroAnalytics Has No Vexatious-Refusal Claim Against AXIS. ........................................................................................ 51

V.    CONCLUSION ................................................................................................. 52

## I.   INTRODUCTION[1]

Two environmental remediation and demolition firms—Industrial Demolition LLC and EnviroAnalytics Group LLC ("Policyholders")—sued their respective commercial insurance carriers—Nautilus Insurance Company and AXIS Surplus Insurance Company ("Insurers")—on claims rooted in the Insurers' alleged failure to support the Policyholders in litigation between the Policyholders and a third party.

Now before the Court are the Insurers' Motions to Dismiss. (*See* ECF No. 25 (AXIS); ECF No. 26 (Nautilus).)  The Motions are fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2023).

For the reasons set forth below, the Motions to Dismiss will be granted.  All requests for declaratory relief will be dismissed without prejudice.  Each of Industrial Demolition's claims against Nautilus will be dismissed for want of insurance coverage.  And two of EnviroAnalytics' claims against AXIS will be dismissed because they are unsupported under the law that applies.

## II.   BACKGROUND

### A.   Factual Background[2]

EnviroAnalytics and Industrial Demolition are each incorporated and based in Missouri. (ECF No. 1 ¶ 5.)  AXIS is incorporated in Illinois, is based in Georgia, and is licensed to do (and does) business in Maryland.  (*Id.* ¶¶ 7, 10.)  Nautilus is incorporated and based in Arizona and is licensed to do (and does) business in Maryland.  (*Id.* ¶¶ 8, 10.)

---

[1] This Memorandum (but not the accompanying Order) will be docketed under seal to protect the confidentiality of settlement negotiations that occurred in an earlier litigation relevant to this matter.  The parties will be directed to file a proposed unsealed version of this Memorandum with narrowly tailored redactions, to the extent any are necessary. Subject to the Court's approval, that redacted version will be made publicly viewable on the Court's docket.

[2] The following representations of fact are reproduced from the allegations of the Policyholders' Complaint and the statements of exhibits attached thereto.  (ECF Nos. 1, 1-1 to -5.)  For purposes of assessing the pending motions, these are assumed true.  *See Adams v. Bain*, 697 F.2d 1213, 1216 (4th Cir. 1982); *see generally infra* Part III.

Between April 2021 and December 2023, the Policyholders defended—and later settled—claims brought by a third party in separate litigation. (*See* ECF No. 1 ¶¶ 50–72, 90, 105–08, 111, 128–30.) That litigation arose from events that took place during the redevelopment of the site of a former steel plant in Baltimore. *See generally Tradepoint Atl., LLC v. Env't Liab. Transfer, Inc.*, Civ. No. GLR-21-1238, 2022 WL 4564633, at *1–3 (D. Md. Sept. 29, 2022). The case began in the Circuit Court for Baltimore City, after which it was timely removed to this Court. (*See* ECF No. 1 ¶¶ 50, 52.) The plaintiff pressed claims sounding in fraud, breach of contract, conspiracy, professional negligence, and misrepresentation.[3] (*See id.* ¶¶ 53–59; ECF No. 1-3 at 26–42.)

At the time the underlying litigation commenced, each Policyholder had entered a contract for commercial insurance with one of the Insurers: EnviroAnalytics with AXIS, (*see* ECF No. 1 ¶¶ 12–13, 17–31), and Industrial Demolition with Nautilus, (*see id.* ¶¶ 32–33, 37–49). Each policy was delivered and paid in Missouri. (*Id.* ¶¶ 14–15, 34–35.) The contracts obliged the Insurers to indemnify and defend the Policyholders, under certain conditions and within certain limits, for specific on-the-job conduct that caused bodily injury, property damage, or other harms.[4] (*See id.* ¶¶ 17–31, 37–49; *see generally* ECF Nos. 1-1, 1-2.)

EnviroAnalytics' contract with AXIS contained a choice-of-law provision that, in the event of a dispute "over the meaning, interpretation or operation of any term, condition, definition or provision of [that] [p]olicy," required the parties to apply the contract law of New York. (ECF No. 1-1 at 31.) Industrial Demolition's contract with Nautilus contained no similar provision. (*See* ECF No. 1-2.)

---

[3] The underlying claims and allegations will be discussed in greater detail below, as relevant to the Court's analysis of one of the Insurers' arguments for dismissal. *See infra* Section IV.B.3.ii.b.

[4] As with the underlying claims, *supra* note 3, these coverages will be discussed in greater detail below, as relevant to the Court's analysis of one of the Insurer's arguments for dismissal. *See infra* Section IV.B.3.ii.a.

As the underlying litigation unfolded, the parties' relationships appeared, in some respects, to stand on solid footing. To trigger the protections of their individual policies, each Policyholder timely apprised its Insurer of the underlying proceedings, (*see* ECF No. 1 ¶¶ 73, 79), after which each Insurer agreed to defend its Policyholder in the same (though Nautilus's acquiescence came only after it initially declined), (*see id.* ¶¶ 74–78, 80–87).[5]  In mid-September 2023, following a ruling on early dispositive motions, (*see generally id.* ¶¶ 53–72), counsel for the Policyholders informed the Insurers of the underlying parties' intent to enter mediation. (*Id.* ¶ 88.)  Two weeks later, at AXIS's request, the Policyholders provided AXIS with "a detailed pre-mediation report summarizing the claims, damages, and risks at issue" in the case. (*Id.* ¶ 89.)  Representatives from AXIS and Nautilus remotely attended an October 17, 2023, mediation session. (*Id.* ¶¶ 90–92.)  A few weeks after that, at both Insurers' request, the Policyholders updated their pre-mediation report. (*See id.* ¶ 93.)  And throughout the process, the Policyholders' counsel "participated in various phone calls" with the Insurers to discuss the topics addressed in the documents. (*Id.* ¶ 94.)

But issues began to arise. In the Policyholders' view, one issue stemmed from the fact that, around June 2023, AXIS had assigned a new adjuster to manage its interests in the litigation. (ECF No. 1 ¶ 95.)  That adjuster had been on the job for only four months and had not previously served as an adjuster for any other company. (*See id.* ¶¶ 96–97.)  To the Policyholders, "[i]t was apparent" from discussions with the adjuster that the adjuster "did not adequately understand" the parties or the claims; the exposure and other risks of trial; federal procedure; or "the tripartite relationship"— that between an insurer, its insured, and the counsel the insurer hires to *defend* the insured—and "the duties emanating therefrom." (*Id.* ¶ 101.)  The Policyholders also allege that the adjuster was

---

[5] In agreeing to defend EnviroAnalytics, AXIS expressly reserved its rights later to contest liability and deny coverage. (*See* ECF No. 1 ¶¶ 74–76.)  But Nautilus, in agreeing to defend Industrial Demolition, did *not* expressly reserve (or waive) those same rights—not in writing, anyway. (*See id.* ¶¶ 85–87.)

"not adequately prepared" for the mediation, despite having suggested it. (*Id.* ¶¶ 99–100.) As a result, the Policymakers believed that the adjuster was ill equipped "to oversee a case of [that] magnitude and complexity." (*Id.* ¶ 98.)

Another issue arose during the mediation. The Policyholders allege that, at the October 17 session, they "expressed willingness to contribute to a settlement" so long as the Insurers would also contribute. (ECF No. 1 ¶ 103.) But the representatives for the Insurers "did not come . . . with sufficient authority" to commit to any amount. (*Id.* ¶ 104.) This forced the Policyholders to agree to only a conditional settlement. (*Id.* ¶ 105.) Still, neither Insurer objected to the proposed terms, before or after the parties agreed upon them. (*See id.* ¶¶ 107, 109–10.) Without pushback from the Insurers, the parties were able to finalize the settlement on November 16, one month after the session. (*See id.* ¶ 108.)

Yet the settlement itself precipitated even further issues. That agreement set two relevant deadlines. It set December 7, 2023, as the deadline for the Policyholders to pay the plaintiff an agreed-upon upper settlement amount. (ECF No. 1 ¶ 111.) And it set December 18, 2023, as the deadline for the plaintiff either to accept an agreed-upon *lower* amount or to reject it and resume litigation. (*Id.* ¶ 120.) Both amounts were within the limits of AXIS's and Nautilus's policies, (*id.* ¶¶ 114–15, 123–24), and the Policyholders say the Insurers were jointly and severally obligated to pay them,[6] (*id.* ¶¶ 116, 125).

On November 7, not long before the settlement agreement was finalized, the Policyholders wrote the Insurers "demand[ing]" the Insurers pay the upper amount by the December 7 deadline. (ECF No. 1 ¶ 112.) But the Insurers refused. (*Id.* ¶ 117.) On December 6, the Policyholders again

---

[6] The Policyholders separately suggest that, under the terms of the conditional settlement, the upper amount would be paid if and only if the Insurers agreed to fund the settlement, while the lower amount would be paid in the event the Insurers did *not* agree to fund the settlement. (*See* ECF No. 1 ¶ 106.) It is unclear how this squares with the assertion that the Insurers were jointly and severally obligated to pay either amount. (*See id.* ¶¶ 116, 125.)

wrote the Insurers, explaining that the Insurers' refusal to pay the upper amount would leave the Policyholders "no choice" but to offer the plaintiff the lower amount. (*Id.* ¶ 121.) They also noted that the refusal—along with the Insurers' failure to provide a written explanation of that decision, despite the request for a "prompt" one, (*see id.* ¶ 113)—was prejudicing the Policyholders in the negotiations. (*Id.* ¶ 122.) But the Insurers were unmoved, and by the next day (the December 7 deadline) they still had offered no written explanation of their adverse position. (*See id.* ¶ 118.)

Accordingly, counsel for the Policyholders were forced, on the day of the deadline, to write counsel for the plaintiff to explain that the Insurers—and therefore the Policyholders—would not be paying the upper amount. (ECF No. 1 ¶ 119.) Plaintiff's counsel responded that there was a "high potential" the plaintiff would reject the alternative lower amount and proceed with its claims. (*Id.*) The Policyholders relayed this message to the Insurers, noting that the plaintiff's position could expose the Policyholders to "substantial further defense costs" and "a potential judgment in excess of coverage limits." (*See id.*)

Fortunately for the Policyholders, the plaintiff eventually did agree—on December 18, the second deadline—to settle for the lower amount. (ECF No. 1 ¶ 128.) But by then the Insurers had informed the Policyholders that they would not fund that amount, either. (*See id.* ¶¶ 126–27.) Like the decision not to fund the upper amount, this second refusal was never explained in writing—at least, not as of December 18. (*Id.* ¶ 127.) The second refusal also forced the Policyholders, on December 21, to pay the lower amount out of their own accounts.[7] (*Id.* ¶¶ 129–30.)

On January 16, 2024, counsel for the Policyholders demanded that the Insurers reimburse the Policyholders for their out-of-pocket settlement payment. (ECF No. 1 ¶ 131.) That letter also

---

[7] Again, it is unclear the extent to which this possibility was known to the Policyholders, given what appears to be the settlement's contemplation of a situation in which the Insurers declined to pay the lower amount. *See supra* note 6.

7

requested a "prompt" explanation, in writing, of the Insurers' positions. (*Id.* ¶ 132.) By April 2, 2024, having still not heard (at least not in writing) from the Insurers—nor having been paid back for their expenditures—the Policyholders wrote to the Insurers yet again. (*Id.* ¶ 133.) To date, neither Insurer has reimbursed the Policyholders for their joint settlement payment. (*See id.* ¶ 134.) Nor has Nautilus offered a written explanation of its refusal to do so. (*Id.* ¶ 137.) And while AXIS *did* offer a written explanation on April 11, 2024, (*id.* ¶ 135), the Policyholders insist that this explanation is neither "factually [n]or legally supportable," (*id.* ¶ 136).

Separate and apart from the cost of any settlement payment is the cost of the Policyholders' litigation defense. In the Policyholders' telling, AXIS upheld its end of the bargain, having paid for EnviroAnalytics' defense up to and through settlement. (*See* ECF No. 1 ¶¶ 78.) But Nautilus did not. In January 2022, Industrial Demolition sent Nautilus a bill for all defense costs between April and November 2021. (*See id.* ¶ 138.) Yet despite repeated follow-up communication from Industrial Demolition, Nautilus did not reimburse those costs until July 5, 2023, over a year and a half later. (*Id.* ¶¶ 139–41.) Nautilus still has not reimbursed Industrial Demolition for defense costs *after* November 2021, which—as of October 2024—total $106,662.67. (*Id.* ¶¶ 142–46.)

### B.    Procedural History

On October 11, 2024, the Policyholders filed their Complaint. (ECF No. 1.) They press claims under a total of five counts:

- Count I, which the Policyholders style as a declaratory judgment count, brought against both Insurers to determine the contractual duties owed (and breached) among the parties, (*see id.* ¶¶ 147–50);
- Count II, a common-law breach-of-contract count, brought against Nautilus for its alleged failure to defend Industrial Demolition (by virtue of not paying the costs of its defense), (*see id.* ¶¶ 151–54);
- Count III, a second common-law breach-of-contract count, brought against both Insurers for their alleged failure to indemnify the Policyholders (by virtue of not paying either the upper or lower settlement amounts), (*see id.* ¶¶ 155–59);
- Count IV, a common-law bad-faith-failure-to-settle count, brought against both

Insurers for their alleged shortcomings and unreasonable positions during the settlement process, (*see id.* ¶¶ 160–69); and

- Count V, a vexatious-refusal-to-pay count under sections 375.296 and 375.420 of the Missouri Revised Statutes, brought against both Insurers on the ground that their alleged refusal to settle "was vexatious and without reasonable cause or excuse," (*see id.* ¶¶ 170–72).[8]

The Policyholders seek both declaratory and monetary relief. (*See id.* at 24–25.)

On January 10, 2025, each Insurer separately moved to dismiss under Rule 12(b)(6) for failure to state a claim. (ECF Nos. 25–26.) Nautilus moved to dismiss all five counts, (ECF No. 26-1 at 1), while AXIS moved to dismiss only Counts I, IV, and V, (ECF No. 25-1 at 1).

## III.   LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This is so even when the allegations underlying the claim are "doubtful in fact." *See Twombly*, 550 U.S. at 555.

## IV.   ANALYSIS

Both Insurers seek dismissal of the Policyholders' requests for declaratory relief. And each offers identical federal-law arguments in support. Because this question can be resolved without reference to the individual insurance contracts, the Court will address it first.

---

[8] Despite the Complaint having been brought by both Policyholders against both Insurers, the Court understands each Policyholder to bring claims only against its own Insurer. (*See* ECF No. 1 at ¶¶ 2–3.)

Otherwise, the Insurers seek dismissal of the Policyholders' claims (or a subset thereof) for reasons inextricably tied to state law. Complicating matters is the fact that the two Policyholder-Insurer relationships are governed by distinct choice-of-law rules. While the agreement between EnviroAnalytics and AXIS contains a choice-of-law provision, the agreement between Industrial Demolition and Nautilus does not. Given the divergent analyses necessary to ascertain what law governs the issues in dispute, the Court will address all remaining arguments (*i.e.*, those not related to declaratory relief) on an Insurer-by-Insurer basis.

For the reasons below, the Court will dismiss without prejudice the Policyholders' requests for declaratory relief. It will dismiss Industrial Demolition's remaining claims against Nautilus. And it will dismiss EnviroAnalytics' bad-faith and vexatious-refusal claims against AXIS.

### A.    All Requests for Declaratory Relief Will Be Dismissed Without Prejudice as Against Both Insurers.

All parties agree that the declaratory judgment count should be dismissed. In essence, the Insurers argue that the Policyholders' prayer for declaratory relief (which seeks declarations about the parties' contractual duties and breaches) is "redundant" with and "duplicative" of the relief that would be awarded through the resolution of the claims for damages (some of which are brought under a breach-of-contract right of action). (*See* ECF No. 25-1 at 3–4; ECF No. 26-1 at 18; ECF No. 32 at 13–15; ECF No. 33 at 13.) And the Policyholders concur, offering as a rationale the fact that the underlying litigation "has been resolved and, therefore, there are no ongoing duties to declare." (ECF No. 28 at 21; ECF No. 29 at 15.) The sole basis for disagreement is whether the requests for declaratory relief should be dismissed with or without prejudice.

As an initial matter, the Court will dismiss the Policyholders' declaratory judgment count as against both Insurers. But it will do so for a different reason than the ones the parties offer: The Declaratory Judgment Act authorizes a remedy, but it does not supply a right of action. *See, e.g.*,

10

*Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 752 n.6 (D. Md. 2020) (citation omitted);

*NAACP v. U.S. Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 578 (D. Md. 2019)); *see also* 28

U.S.C. § 2201(a) (titled "Creation of remedy"); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240

(1937). For that reason alone, Count I—the declaratory judgment count—must be dismissed.

The parties apparently see the dismissal of Count I as equivalent to dismissing the prayer

for declaratory relief in toto. (*See, e.g.*, ECF No. 25-1 at 3 (referring to dismissal of an "action"

and a category of "relief"); ECF No. 26-1 at 18 (referring to dismissal of the "claim" for declaratory

judgment); ECF No. 28 at 22 (same); ECF No. 29 at 15 (same).) That would not ordinarily be the

case, however, given that "counts" are not usually read as coextensive with a particular remedy, as

well as the fact that declaratory relief is properly awarded in connection with a variety of rights of

action, *see* 28 U.S.C. § 2201(a), including as relief intended to head off future claims, *see, e.g.*,

*Volvo*, 386 F.3d at 594 n.13. Nevertheless, the Court will grant the parties' joint request and dismiss

the whole of the Policyholders' request for declaratory relief, irrespective of which rights of action

that relief might conceivably have been associated.

That leaves only the issue of prejudice. There is ample support for the Insurers' view that

dismissal ought to be final and conclusive. Under the Declaratory Judgment Act, the issue of the

propriety of declaratory relief in any given case is one committed to the discretion of the federal

courts. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–88 (1995); *see also* 10B Charles Alan Wright

& Arthur R. Miller, *Federal Practice and Procedure* § 2759 (4th ed. 2025). And while the law is

clear that declaratory relief is not rendered inappropriate merely by the fact that another adequate

remedy exists, *see* 28 U.S.C. § 2201(a); Fed. R. Civ. P. 57, there is substantial authority for the

view that such relief should be denied when an "alternative remedy is better or more effective,"

Wright & Miller, *supra*, § 2758 & n.6 (collecting cases); *see, e.g.*, *Western v. McGehee*, 202 F.

11

Supp. 287, 293–94 (D. Md. 1962). Courts have often found that an alternative remedy "is better or more effective" when deciding one's entitlement to an alternative remedy would, as a practical matter, *already* require the courts to "declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201(a); *Chevron U.S.A. Inc. v. Apex Oil Co.*, 113 F. Supp. 3d 807, 824–25 (D. Md. 2015). That includes situations like this one, where both damages and declaratory relief are sought to redress alleged breaches of contract. *E.g.*, *Kline v. Hyundai Motor Am. Inc.*, 751 F. Supp. 3d 542, 564–65 (D. Md. 2024) (collecting cases).

But there are countervailing considerations, too. Declaratory relief is a distinct remedy, capable of standing alone. *See, e.g.*, Fed. R. Civ. P. 57 advisory committee's note ("[D]eclaratory relief is alternative or cumulative and not exclusive or extraordinary."); *Green v. Mansour*, 474 U.S. 64, 72 (1985) (similar). And courts should deny it only with "good reason" to do so. *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir. 1937); *see also Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963, 965–66 (4th Cir. 1994) (explaining that federal courts should "normally" entertain declaratory judgment acts when declaratory relief "will serve a useful purpose in clarifying and settling the legal relations in issue" and "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding" (cleaned up and citation omitted)). True enough, a determination—and therefore a declaration—of legal rights and relations is a functional prerequisite to all forms of redress. *See, e.g.*, *Soft Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006). But declaratory relief may still be appropriate and nonredundant in situations where there is no access to other remedies. *See, e.g.*, *Mansour*, 474 U.S. at 72 (citing *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)). Here, there is some possibility, however remote, that the remaining remedy, damages, may be held unavailable. So, while it is virtually costless to sustain the prayer for declaratory relief, it may be potentially costly to discard it—especially when,

12

as now, the risk of an erroneous ruling about the availability of other relief is at its zenith, given

the dearth of briefing or factual development on that issue. *See Clarke v. Newell*, No. 05CV1013,

2005 WL 3157570, at \*4 (E.D. Va. Nov. 23, 2005) ("It is not certain at this early date whether

Plaintiff has an adequate remedy at law, and allowing the equitable remedies to remain results in

few additional demands of the Defendant.").

On balance, the Court sees no need wholly to foreclose the possibility of declaratory relief.

Indeed, there may well be possible negative consequences to doing so at this early juncture. The

requests for declaratory relief will be denied without prejudice.[9]

### B.   Industrial Demolition's Claims Against Nautilus Will Be Dismissed.

Following the Court's dismissal of Count I, the remaining claims Nautilus seeks to dismiss

are Count II (the breach-of-contract claim based on a failure to defend), Count III (the breach-of-

contract claim based on a failure to indemnify), Count IV (the bad-faith-failure-to-settle claim),

and Count V (the vexatious-refusal-to-pay claim).

As explained above, the Nautilus–Industrial Demolition contract does not contain a choice-

of-law clause. (*See* ECF No. 1-2.) Each party contends that Missouri substantive law governs all

questions relevant to Industrial Demolition's remaining claims. (ECF No. 26-1 at 11; *see* ECF No.

28 at 3–4.) And each party argues that, under Missouri law, it prevails on the pending motion to

dismiss. (*See* ECF No. 26-1 at 12 – 22; ECF No. 28 at 5–21.)

The Court agrees with Nautilus, and accordingly, Industrial Demolition's remaining claims

against Nautilus will be dismissed. Below, the Court will set out the choice-of-law rules applicable

to contracts that do not contain choice-of-law provisions. It will use those rules to confirm that

---

[9] The availability of relief, declaratory or otherwise, depends on the viability of the claims on which the relief is sought. Insofar as any claims are dismissed from this case and may not be relitigated in this or other proceedings, any requests for declaratory relief will of course be barred to that same extent.

Missouri law applies in this case. And it will apply that law to the four remaining claims.[10]

1.    Choice-of-Law Rules for Contracts Without a Choice-of-Law Clause.

A federal court exercising diversity jurisdiction over state-law claims applies the choice-of-law rules of the forum state. *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 600–01 (4th Cir. 2004). Here, that is Maryland.

When a contract does not contain a choice-of-law provision, Maryland courts usually apply the *lex loci contractus*—the law of the place where the contract was formed—to decide questions of both meaning and validity. *Allstate Ins. Co. v. Hart*, 611 A.2d 100, 529 (Md. 1992); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 659 A.2d 1295, 1301 (Md. 1995). A contract is formed where "the last act is performed which makes the agreement a binding contract"—which, for insurance, is usually "where the policy is delivered and the premiums are paid." *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 100 (4th Cir. 2013) (citation omitted).

But there are cases (other than those involving a choice-of-law clause) in which Maryland courts will not mechanically apply the *lex loci contractus*. One is when the substance of the *lex loci contractus* is contrary to Maryland's strong public policy. *Am. Motorists*, 659 A.2d at 1301. To fit within this exception, the friction between the *lex loci contractus* and Maryland public policy on the specific contractual issue must be "*very* strong"; it is not enough for the two simply to differ.

---

[10] Although the parties barely note the issue, (*see* ECF No. 28 at 19), and instead simply use Maryland's choice-of-law rules pertaining to contracts, (*see, e.g.*, ECF No. 26-1 at 11), in fact, at least one of Industrial Demolition's claims—the bad-faith-failure-to-settle claim (Count IV)—sounds in tort. *Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1060–61 (Md. 1999). Ordinarily, this would demand that the substantive law governing that claim be chosen through choice-of-law rules relevant to torts, not contracts.

Not so here. As explained below, the nub of Nautilus's argument is that, per the express terms of its policy, Industrial Demolition was not covered under the circumstances of the underlying litigation. *See infra* Section IV.B.3. That is a simple question of contractual interpretation—and, *ipso facto*, an issue governed by the substantive law of contracts. Because the Court agrees with Nautilus that there was no coverage for the acts at issue—and because each of Industrial Demolition's claims relies crucially on the idea that there *was* coverage (no coverage, no duty, no wrong)—there is no need for the Court to wade beyond the interpretation issue and into issues of the legal and factual sufficiency of specific claims. On the claims against Nautilus, the Court will not analyze choice-of-law issues other than those pertaining to contract interpretation.

*See Cunningham v. Feinberg*, 107 A.3d 1194, 1211 (Md. 2015) (emphasis added) (quoting *Hart*, 611 A.2d at 102); *Bethlehem Steel Corp. v. G.C. Zarnas & Co., Inc.*, 498 A.2d 605, 608 (Md. 1985). When this exception is met, Maryland courts apply Maryland law to the question at hand. *See Bethlehem Steel*, 498 A.2d at 610.

Another exception arises when the *fora loci contractus*—the courts of the place where the contract was formed—would have applied Maryland substantive law to resolve the issue. *See Am. Motorists*, 659 A.2d at 1301, 1304. Under this exception, Maryland courts apply Maryland law, not the *lex loci contractus*, whenever (1) the *fora loci contractus* would themselves have applied Maryland law, not their own forum law, to the issue in dispute, and (2) Maryland bears the most significant—"or, at least, a substantial"—relationship to that issue. *Id.* at 1304.

### 2. Missouri Law Governs Industrial Demolition's Remaining Claims Against Nautilus.

Because both the Nautilus–Industrial Demolition policy and the AXIS-EnviroAnalytics policy were delivered and paid in Missouri, (ECF No. 1 ¶¶ 14–15, 34–35), Missouri law is the *lex loci contractus* for both agreements. And again, because the Nautilus–Industrial Demolition policy contains no choice-of-law clause, the *lex loci contractus* applies unless either (1) a strong public policy of Maryland forecloses its application or (2) both of the following are true: (a) the *fora loci contractus*—here, the courts of Missouri—would apply Maryland law to the issues in dispute and (b) Maryland bears at least a "substantial" relationship to those issues.

The Court sees no reason to think either exception applies here.

As to the first, the bulk of Nautilus's argument for dismissal turns not on the availability of a right of action[11]—usually the most fertile ground for a public-policy exception, *see, e.g., Lab'y*

---

[11] Just one of Industrial Demolition's claims, the claim for vexatious-refusal damages (Count V), is brought under law peculiar to Missouri. *See* Mo. Rev. Stat. §§ 375.296, .420. But because the Court holds that dismissal is appropriate on the analytically prior ground of whether Industrial Demolition was covered under the policy at all, *cf. supra* note

*Corp. of Am. v. Hood*, 911 A.2d 841, 848–49 (Md. 2006) (collecting cases)—but on the meaning

(and particularly the scope) of the terms of its insurance coverage. (*See* ECF No. 26-1 at 12–18.)

Specifically, the parties dispute a garden-variety interpretive issue: whether Industrial Demolition

was covered by the policy under the circumstances of the underlying litigation. (*See id.*; ECF No.

28 at 5–16.) Whichever way Missouri contract law happens to go on that issue, the Court is aware

of no strong public policy of Maryland that would foreclose a result either way, and the parties for

their part gesture to none.

As to the second, Missouri courts would apply Missouri law, not Maryland law, to the

disputed issues.[12] To decide which law governs the interpretation of insurance contracts, Missouri

employs the most-significant-relationship test of the Restatement (Second) of Conflict of Laws

(hereinafter "Second Restatement"). *See Doe Run Res. Corp. v. Certain Underwriters at Lloyd's*

*London*, 400 S.W.3d 463, 472 (Mo. Ct. App. 2013). The factors that inform the most significant

relationship are "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the

place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e],

residence, nationality, place of incorporation and place of business of the parties." Second

Restatement § 188(2). And those factors collectively point to Missouri, not Maryland. Missouri

is where the policy was delivered and paid, (ECF No. 1-1 ¶¶ 34–35), likely triggering either or

both factors (a) and (b). Missouri is also the state of Industrial Demolition's incorporation and

---

10, there is no occasion for this Court to apply foreign law to Industrial Demolition's claims, and therefore no occasion to ask whether some strong public policy of Maryland forbids it. The Court revisits this issue in its discussion of the AXIS-EnviroAnalytics contract. *See infra* Section IV.C.2.ii.a.

[12] The Court assumes, *arguendo*, that Maryland bears a "substantial" relationship with those issues, *see Am. Motorists*, 659 A.2d at 1304, particularly given that it is the site of both the underlying litigation and the events that gave rise to it. (*See* ECF No. 1 ¶ 11.)

principal place of business, (*id.* ¶ 6), triggering factor (e).[13]   Maryland only plausibly triggers

factors (c) and (d)—and even then, only by the fortuity of the events and forum of the underlying

litigation, given that the insurance contract's contemplated place of performance was anywhere in

the United States or Canada, (*see* ECF No. 1-2 at 33). *See St. Paul Fire & Marine Ins. Co. v. Bldg.

Constr. Enters., Inc.*, 484 F. Supp. 2d 1004, 1006–09 (W.D. Mo. 2007) (applying Missouri law to

a commercial insurance contract where, as here, the contract was formed in Missouri but, because

of its relatively unbounded coverage area, it was not "possible to predict with fair accuracy where

the risk w[ould] be located"), *aff'd*, 526 F.3d 1166 (8th Cir. 2008); *Reyes v. Nationwide Mut. Ins.

Co.*, No. 10-cv-01381, 2011 WL 2314158, at *4 (E.D. Mo. June 9, 2011).

Seeing no reason to think either of the two exceptions to the doctrine of *lex loci contractus*

apply, the Court applies Missouri law to the disputed interpretive issues.

3.      Under Missouri Law, Nautilus Owed No Duties to Industrial Demolition in
        the Underlying Litigation.

Nautilus offers essentially two arguments to dismiss all or some of the remaining claims.

First, it argues that its policy with Industrial Demolition did not cover the claims against Industrial

Demolition in the underlying litigation, which gave it no duties to defend or indemnify Industrial

Demolition in the same. (*See* ECF No. 26-1 at 12–18.)  Second, it argues that, even if the policy

*did* cover the underlying claims, Industrial Demolition has not pled facts enough to sustain Counts

IV and V (the bad-faith and vexatious-refusal claims), and therefore they—along with Count I, the

declaratory judgment claim—should be dismissed as well. (*See id.* at 18–21.)

Industrial Demolition responds that Nautilus has waived its right to make the no-coverage

argument, given that Nautilus "initially denied coverage, then reconsidered its coverage denial,

---

[13] Also bearing on factor (e) is the fact that Nautilus is both incorporated and headquartered in Arizona.  (ECF No. 1
¶ 8.)  But because Arizona has no other connection with this dispute, its relationship is dwarfed by that of other states—
especially Missouri—and therefore has no chance of being deemed the "most significant."

and [then] ultimately defended" Industrial Demolition in the underlying litigation. (ECF No. 28 at 5–7.) And even absent any such waiver, Industrial Demolition contends, the policy did in fact reach the underlying allegations. (*See id.* at 7–16.)

The Court agrees with Nautilus: the claims asserted against Industrial Demolition in the underlying litigation were not covered by the insurance policy. All four of the remaining claims brought by Industrial Demolition—the two breach-of-contract claims (Counts II and III), the bad-faith-failure-to-settle claim (Count IV), and the vexatious-refusal-to-pay claim (Count V)—will be dismissed. The Court need not reach Nautilus's separate arguments on Counts IV and V.

The Court addresses the issue of waiver, then the issue of coverage.

> **i.** **Nautilus Has Not Waived—nor Will It Be Estopped from Asserting—**
> **Its Coverage Defenses.**

It is "well[-]settled and long-standing law in Missouri" that "the doctrines of waiver and estoppel may not be employed to create insurance coverage where the risk is not insured under the policy." *Great West Cas. Co. v. Wenger*, 748 S.W.2d 926, 928 (Mo. Ct. App. 1988) (collecting cases); *accord Blew v. Conner*, 328 S.W.2d 626, 631 (Mo. 1959) (en banc) ("Waiver or estoppel cannot be used to create a cause of action but only to preserve pre-existing rights."); *Assoc'd Indem. Corp. v. Miller-Campbell Co.*, 596 S.W.2d 383, 389 (Mo. 1980) (similar).

In other words, an insurer will not waive or be estopped from asserting a defense based on the scope of the underlying coverage. *See, e.g., Scottsdale Ins. Co. v. Am. Detective Servs.*, No. 22-06049-CV, 2023 WL 6370776, at *6–7 (W.D. Mo. Aug. 30, 2023) (collecting cases). Rather, it may waive or be estopped from asserting only those defenses having to do with ancillary factual or procedural matters—matters like the fact that an insured's time to file a coverage claim had expired, *see Brown v. State Farm Mut. Auto. Ins. Co.*, 776 S.W.2d 384, 387 (Mo. 1989) (discussing *Goffe v. Nat'l Sur. Co.*, 9 S.W.2d 929 (Mo. 1928)), the fact that an insured had filed a claim based

18

on a collision in a vehicle that she had failed to register with the insurer (but which, properly registered, would have been covered), *see Am. Detective Servs.*, 2023 WL 6370776, at *6 (discussing *Stone v. Waters*, 483 S.W.2d 639 (Mo. Ct. App. 1972)), or the fact that an insurer later estimated actual damages lower than the amount the insured had initially claimed, *see Stacy v. Bar Plan Mut. Ins. Co.*, 621 S.W.3d 549, 563–65 (Mo. Ct. App. 2021) (citing *Advantage Bldgs. & Exteriors, Inc. v. Mid-Continent Cas. Co.*, 449 S.W.3d 16, 22–24 (Mo. Ct. App. 2014)).[14]

Nautilus does not argue that Industrial Demolition's claims for coverage did not merit the amount sought, were time barred, or were afflicted by procedural defects discoverable through reasonable diligence. Instead, it argues that the underlying events were not of the type covered by the agreement. (ECF No. 26-1 at 12–18.)

Whether or not Nautilus is correct on that point, its defense—and, more precisely, its ability to *make* that defense—is immune to attacks based on waiver and estoppel. If a policy's coverage does not reach the events at issue, whether on the face of the policy or because of an exclusion, waiver and estoppel do not apply. *See Wenger*, 748 S.W.2d at 928–29 (citing *State Farm Mut. Auto. Ins. Co. v. Hartford Accident & Indem. Co.*, 646 S.W.2d 379, 381 (Mo. Ct. App. 1983)).[15]

---

[14] Some courts have described the defenses in this latter category as "defenses to coverage" and those in the former category as defenses based on "limits of liability." *See, e.g.*, *Stacy*, 621 S.W.3d at 563; *W. Heritage Ins. Co. v. Asphalt Wizards*, 795 F.3d 832, 837 (8th Cir. 2015) (citing *Martin v. U.S. Fid. & Guar. Co.*, 996 S.W.2d 506, 511 (Mo. 1999)).

[15] Industrial Demolition insists that this cannot be squared with the case of *Kinnaman-Carson v. Westport Ins. Corp.*, 283 S.W.3d 761 (Mo. 2009). There, the Missouri Supreme Court held that an insurer waived its right to assert coverage defenses when it agreed to defend an underlying suit "without a reservation of rights." *Id.* at 762. In that court's view, "[t]he insurer should have resolved any issues about the validity of its agreement to provide coverage without a reservation of rights in the lawsuit to which that agreement applied." *Id.*

This argument is unpersuasive. It is blackletter Missouri law that waiver and estoppel cannot create coverage that does not already exist. And Nautilus's argument, whatever its merits, is that the claims Industrial Demolition sought Nautilus's aid in defending were not covered under the policy. Again, Nautilus can neither waive nor be estopped from raising that argument. *See, e.g.*, *Blew*, 328 S.W.2d at 631; *Miller-Campbell Co.*, 596 S.W.2d at 389. This Court will not read *Kinnaman-Carson* as surreptitiously carving out an exception to an otherwise categorical, longstanding rule, particularly when the court did not even mention the rule, much less purport to depart from it.

Even if the Court *were* willing to make that analytical leap, absent contrary authority, it would not read the exception to apply to the facts of this case. *Kinnaman-Carson* involved an insurer that first agreed to defend its insured "under a reservation of rights," then—only after the insured rejected the offer—notified the insured that the insurer

> ii.    *The Nautilus–Industrial Demolition Policy Did Not Cover Claims that Were or Might Have Been Brought in the Underlying Litigation Against Industrial Demolition.*

The balance of Nautilus's argument proceeds in two parts. First, Nautilus contends that, as a general matter of law, if claims against an insured are outside the scope of its policy, an insurer owes no duties and cannot be made to pay in later litigation. (ECF No. 26-1 at 12, 16–17.) Second, Nautilus applies that rule here and argues that the underlying claims were not within the scope of Industrial Demolition's policy—and, therefore, cannot support the present suit. (*Id.* at 12–16.)

On the first point, Nautilus is correct: if the third-party claims were outside the scope of its coverage, then it had no duty to defend, indemnify, or otherwise assist Industrial Demolition in the underlying litigation, and all putative violations that rest on a failure to fulfill those duties—like the claims Industrial Demolition presses here—are inadequate as a matter of law. After all, the duties to defend and indemnify, while triggered by distinct quanta of fact, rely on the proposition that coverage *would* be available in the right factual circumstances. *See, e.g., McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 170 (Mo. 1999) ("The duty to defend arises whenever there is a potential or possible liability to pay based on the facts at the outset of the case and is not dependent on the probable liability to pay based on the facts ascertained through trial."); *id.* at 173 ("The duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, for example through summary

---

had "*dropped* its reservation of rights and agreed to defend the suit *without* reservation." 283 S.W.3d at 763 (emphasis added). What's more, the insurer eventually conceded in court "that it *had* agreed to defend . . . without a reservation of rights but nonetheless denied coverage." *Id.* at 764 (emphasis added). The facts here are different. Nautilus never said anything about a reservation of rights, neither asserting nor disclaiming one, and it certainly never withdrew a reservation after making one and seeing it rejected by the insured. (*See* ECF No. 1 ¶¶ 80–87.) The Court is unwilling to say that *Kinnaman-Carson* requires a conclusion that Nautilus waived or is estopped from raising its policy-limits defense—even to the highly unlikely extent that *Kinnaman-Carson* could be read to permit waiver or estoppel of that kind at all. *See Morgan v. State Farm Fire & Cas. Co.*, 344 S.W.3d 771, 779–80 (Mo. Ct. App. 2011) (reading *Kinnaman-Carson* in harmony with the general rule); *Stacy*, 621 S.W.3d at 563–65 (same, and observing that an insurer "had no duty to reserve its rights as to the applicable [l]imits of [l]iability, because limits of liability are not defenses to coverage and cannot be waived").

judgment or settlement."). If coverage would never be available, the two duties do not obtain.[16]
*See Allen v. Bryers*, 512 S.W.3d 17, 31 (Mo. 2016). The same is true of liability based on bad-faith failure to settle, *see Scottsdale Ins. Co. v. Addison Ins. Co.*, 448 S.W.3d 818, 827 (Mo. 2014) (stating that the third element of a bad-faith claim is "fraud or bad faith in refusing to settle a claim *within the limits of the policy*" (emphasis added)), and vexatious refusal to pay, *see Sloan v. Farm Bur. Town & Country Ins. Co. of Mo.*, 696 S.W.3d 481, 484 (Mo. Ct. App. 2024) ("[W]here an insurer had no duty to pay under the insurance policy, there cannot be a claim for vexatious refusal to pay." (alteration in original) (citation omitted)).

On the second issue, Nautilus likewise prevails: the underlying claims against Industrial Demolition were beyond the scope of the policy. The Court will recount the relevant coverages. It will describe the underlying claims and allegations. And it will explain how, under Missouri law, those claims and allegations did not trigger any duties on the part of Nautilus.

a.      The Nautilus–Industrial Demolition Policy

Start with the policy itself. Although the contract provides a variety of coverages, *(see generally* ECF No. 1-2), Industrial Demolition flags just three as "potentially applicable" under the circumstances of the underlying litigation. Those are Nautilus's commercial general liability ("CGL") coverage, its pollution liability coverage, and its professional liability coverage. *(See* ECF No. 1 ¶¶ 32–49; ECF No. 28 at 7–16 & n.3.)

Nautilus's CGL coverage guarantees, in relevant part, that Nautilus will "pay those sums

---

[16] The Court observes that, at least on the question of whether an insurer's duty to defend has been triggered, the test is highly permissive—even more permissive than that for stating a claim sufficient to survive a motion to dismiss. *See Truck Ins. Exch. v. Prairie Framing, LLC*, 162 S.W.3d 64, 83–84 (Mo. Ct. App. 2005). But Missouri law is clear that the test for even the most permissive duty, the duty to defend, turns on a "potential or possible" set of *facts* (*i.e.*, those that do or could comprise a claim within the scope of the policy), not on a "potential or possible" theory of *law* (*i.e.*, a theory of what the policy actually covers). *See id.* at 83; *see also Am. Econ. Ins. Co. v. Jackson*, 476 F.3d 620, 624 (8th Cir. 2007); *McCormack Baron*, 989 S.W.2d at 170–71; *Zipkin v. Freeman*, 436 S.W.2d 753, 754–55 (Mo. 1968) (en banc). Not even the most favorable factual circumstances can "in effect rewrit[e]" the insurance contract. *Cf. Miller-Campbell*, 596 S.W.2d at 389.

that [Industrial Demolition] becomes legally obligated to pay as damages because of . . . property damage . . . to which this insurance applies." (ECF No. 1-2 at 8 (emphasis added).) "Property damage" is defined as any "[p]hysical injury to tangible property, including resulting loss of use of that property"; any "[l]oss of use of tangible property that is not physically injured"; and any "cleanup costs and natural resource damage." (*Id.* at 36.) And the CGL coverage applies to all such damage "caused by an occurrence" in the coverage territory. (*Id.* at 8.) "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 35.)

Nautilus's pollution liability coverage is similar. It provides, in relevant part, that Nautilus will "pay those sums that [Industrial Demolition] becomes legally obligated to pay as damages because of . . . property damage . . . resulting from any pollution conditions to which this insurance applies." (ECF No. 1-2 at 15.) The coverage reaches all "property damage" caused by a "pollution condition," which itself must be caused by an "occurrence." (*See id.* at 15–16.) "Property damage" and "occurrence" are defined the same as above, (*see id.* at 35–36), while "pollution condition" refers to "the discharge, dispersal, release, seepage, migration, or escape of pollutants," (*id.* at 35).

Finally, Nautilus's professional liability coverage promises, in relevant part, that Nautilus will "pay those sums that [Industrial Demolition] becomes legally obligated to pay as damages . . . that result from professional services to which this insurance applies." (ECF No. 1-2 at 18.) To be covered, damages "must result from an actual or alleged act, error or omission in [Industrial Demolition's] performance of professional services." (*Id.*) "Professional services" refers to "those services performed by [Industrial Demolition] or on [its] behalf, that are related to [its] practice as an engineer, consultant, architect, or surveyor that are performed for others for a fee." (*Id.* at 36.)

     b.  The Claims, Allegations, and Facts of the Underlying Suit

Next, the underlying suit. The claims against Industrial Demolition were brought under a total of five counts: fraudulent conveyance by an insolvent, (ECF No. 1-3 at 26–27); conveyance made with intent to defraud, (*id.* at 27–28); fraudulent conveyance of partnership property, (*id.* at 28–29); breach of contract involving a third-party beneficiary, (*id.* at 29–32); and civil conspiracy, (*id.* at 39–42). (*See generally* ECF No. 1 ¶¶ 53, 55–59.)

But the inquiry does not end there. Whether an insurer's duties are triggered is governed by the totality of a case—its allegations, the substance of its legal theories, and any other learnable facts—and not by "the labels the [underlying] plaintiff chooses to attach to [its] claims." (ECF No. 28 at 9); *see Spirco Env't, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 555 F.3d 637, 640–41 (8th Cir. 2009) (collecting cases); *Allen v. Cont'l W. Ins. Co.*, 436 S.W.3d 548, 552–53 (Mo. 2014).

With that in mind, a survey of the underlying complaint yields many pertinent allegations. Some offer information and context relevant to all underlying claims. For instance, the complaint contends that EnviroAnalytics and Industrial Demolition were under common ownership and control, (*e.g.*, ECF No. 1-3 at 5, 7), and were structurally related to the other defendants as well, (*e.g.*, *id.* at 5–7, 12–13). It also contends that EnviroAnalytics hired Industrial Demolition as a subcontractor on a redevelopment project, whereby Industrial Demolition agreed to dredge and maintain a canal and to perform certain cleanup work. (*E.g.*, *id.* at 6, 17.) That subcontract was worth roughly $7.1 million and stipulated that Industrial Demolition would be paid on a time-and-materials basis. (*E.g.*, *id.* at 17, 30, 40.) Its payment would derive from certain trust funds, to be distributed upon request by the Policyholders and/or affiliated entities. (*See, e.g.*, *id.* at 4–5, 17.)

The remaining allegations spoke directly to one or more of the underlying plaintiff's three general grievances. Those grievances were (1) that Industrial Demolition and certain affiliated entities breached various agreements by performing or allowing unneeded work on the project; (2)

that, in an effort to avoid liability for those breaches, Industrial Demolition and certain affiliated entities unlawfully moved assets between one another; and (3) that the foregoing acts were part and parcel of a scheme among Industrial Demolition and its codefendants to defraud the underlying plaintiff. (*See generally* ECF No. 1-3.)

As relevant to the breach issue, the underlying complaint alleged that Industrial Demolition generally "failed to complete" the redevelopment project in accordance with the contractual terms. (ECF No. 1-3 at 30; *see also id.* at 33–36, 40.) It alleged that Industrial Demolition performed "unnecessary and superfluous" work, (*id.* at 3; *see also id.* at 33, 41), by removing at least nineteen percent more material, and dredging at least twenty-four percent deeper, than had been approved, (*id.* at 6, 18–19, 21–22, 30–31, 35, 37–38, 40). In the plaintiff's view, Industrial Demolition "knew or should have known, but did not disclose," that it was dredging more and deeper than necessary. (*Id.* at 19.) And because much of its work was unwarranted, Industrial Demolition's performance was "materially and substantially defective." (*Id.* at 22.) As a "direct and proximate [result] of [this] breach," the underlying plaintiff suffered multiple distinct harms, (*see id.* at 31), including "substantial overcharges due to excess excavation and resulting equipment and labor hours," (*id.* at 22; *see also id.* at 6, 12–13 (alleging that Industrial Demolition earned approximately $11 million for its work, about $3.9 million over the budgeted $7.1 million amount)), and approximately $1.1 million in lost landfill capacity due to Industrial Demolition dumping nearly 28,592 tons of excess material in the plaintiff's on-site landfills, (*id.* at 18, 22–23, 31, 33, 36, 39, 41). The complaint also alleged that EnviroAnalytics, in dereliction of its duties as prime contractor, failed to see that Industrial Demolition was "taking action on non-essential tasks designed to inflate invoices," (*id.* at 33), and "overworking and overbilling" on the dredging, (*id.* at 35–36; *see also id.* at 39).

On the liability-evasion issue, the underlying complaint alleged that Industrial Demolition

was a beneficiary of one of its codefendant's "scheme . . . to fraudulently distribute [trust] funds to all or some of" its affiliates. (ECF No. 1-3 at 13.)  Specifically, it alleged that Industrial Demolition "either directly or indirectly" received several "improper conveyances" that were "not made upon adequate or fair consideration" but instead aimed to make the conveyor insolvent—and, as a result, "judgment proof." (*See id.* at 3, 13, 26–27; *see also id.* at 28 (explaining that the defendants "acted in a manner to put these funds . . . beyond the reach of th[e] [c]ourt").)

Finally, on the conspiracy issue, the underlying complaint alleged generally that Industrial Demolition "entered into an agreement to defraud [the underlying plaintiff] by overworking the [dredging project] far in excess of the design plan, and reporting to [the plaintiff] the opposite, all for their own financial gain." (ECF No. 1-3 at 39.)  In furtherance of that conspiracy, Industrial Demolition "performed unjustifiable and superfluous work"—the deeper, unneeded dredging that formed the basis of the purported breaches, *supra*—then prepared invoices for the same. (*See id.* at 40–41.)  The complaint also stated that Industrial Demolition "knew that [the plaintiff] would allow, and in fact did allow, . . . Industrial Demolition to dispose of the [e]xcess [m]aterial at [the plaintiff's] landfills," thereby "deplet[ing] . . . valuable landfill space." (*Id.* at 41.)

These allegations are the factual basis on which this Court must assess whether Nautilus owed any duties. The Court would usually look beyond the allegations and consider *all* facts that an insurer, through reasonable diligence, could have discovered once it learned of claims against its insured. *See Sprint Lumber, Inc. v. Union Ins. Co.*, 627 S.W.3d 96, 107 (Mo. Ct. App. 2021). And whether such facts existed—along with what, exactly, those facts were—is itself an issue of fact, not typically suited for resolution at the motion-to-dismiss stage. *Cf. Drury Co. v. Mo. United Sch. Ins. Counsel*, 455 S.W.3d 30, 38–39 (Mo. Ct. App. 2014) (citation omitted).  But Industrial Demolition never alleges that relevant facts existed outside the pleadings, much less that Nautilus

25

failed to exercise reasonable diligence in ascertaining them. The closest it comes is its allegation, made in the context of its bad-faith-failure-to-settle count, that the Insurers "fail[ed] to adequately investigate the claims and risks at issue." (ECF No. 1 ¶ 166(b).) Even assuming this allegation means that the Insurers did not fully investigate for purposes of ascertaining coverage—as opposed to what the surrounding allegations suggest, which is that the Insurers, *after* getting involved in the Policyholders' defense, made little effort to understand the nature of the case and the attendant risks of trial, (*see id.* ¶¶ 161–69)—it would still not be enough, as Industrial Demolition fails to describe what, if anything, the Insurers would have discovered upon a more thorough examination, let alone how that discovery would have sufficed to trigger coverage. Industrial Demolition's own briefing also belies any sense that salient, coverage-triggering facts existed outside the underlying pleadings. (*See* ECF No. 28 at 7 ("The allegations in the underlying litigation trigger Nautilus's coverage obligations."); *id.* at 8–10 (referring exclusively to duties arising from the "underlying allegations" or, simply, "allegations").)

        c.    The Allegations of the Underlying Suit Did Not Trigger Any Duties on the Part of Nautilus.

As explained, under Missouri law, an insurer's duties turn not on a specific label or cause of action, but rather on a set of factual circumstances. *See Spirco Env't*, 555 F.3d at 640–41. While the duty to defend rests on the allegations and all facts reasonably ascertainable at the time a claim is made, the duty to indemnify rests on the facts as they are finally determined. *See McCormack Baron*, 989 S.W.2d at 170, 173; *Bryers*, 512 S.W.3d at 31, 33.

For purposes of the pending motion to dismiss, the Court focuses on whether Nautilus had a duty to *defend* in the underlying litigation. The reason is simple. Because Nautilus argues for dismissal on the basis that *no* duty attached, (*see* ECF No. 26-1 at 12–18), the presence of just one duty is enough to defeat its argument. And because the duty to defend is logically antecedent to

the duty to indemnify, *see Sprint Lumber*, 627 S.W.3d at 114 (citation omitted), the claims survive only to the extent that a duty to defend exists.

This is not a high bar. Time and again, Missouri courts have held that "[i]f the complaint merely alleges facts that give rise to a claim *potentially* within the policy's coverage," an insurer has a duty to defend. *E.g.*, *Bryers*, 512 S.W.3d at 31 (emphasis added) (citation omitted). Indeed, that duty attaches "[e]ven if the plaintiff bringing a claim against the insured initially pleads the 'wrong' cause of action, or one that is likely to be subject to a motion to dismiss," at least so long as, "at the time the claim is made, facts are known to the insurer or could reasonably be ascertained by the insurer that would potentially put the claim within the scope of the policy." *Id.* (citation omitted); *see also Spirco Env't*, 555 F.3d at 640–41 (looking beyond a breach-of-contract label to conclude that "the substance of [a] claim was an allegation of property damage"); *Mo. Terrazzo Co. v. Iowa Nat. Mut. Ins. Co.*, 740 F.2d 647, 650 (8th Cir. 1984) (similar). It does not matter that a plaintiff failed to claim—or perhaps failed to realize that it even *could* claim—damages of a sort covered under the insurance contract. *See Allen v. Cont'l*, 436 S.W.3d at 552–53 & n.4 (holding that there exists a duty to defend "when it is known or reasonably apparent to the insurer at the outset of the case that the plaintiff may be able to amend the petition later to assert a valid claim that potentially is covered under the policy"). For a duty to defend, facts are supreme, and inartful or nonexistent causes of action atop those facts do not eliminate an insured's potential exposure. *See Allen v. Cont'l*, 436 S.W.3d at 552–53; *Truck Ins. Exch. v. Prairie Framing, LLC*, 162 S.W.3d 64, 79 (Mo. Ct. App. 2005) (citation omitted).

The upshot is that the only way for Nautilus "[t]o extricate itself from the duty to defend" is to "prove that there [was] *no possibility* of coverage." *Bryers*, 512 S.W.3d at 31 (emphasis in original) (citation omitted). Nautilus's task is made all the more difficult by the principle that an

insurance policy "will be interpreted, if reasonably possible, to provide coverage," given the policy's fundamental purpose of protecting the insured. *See Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 904 (Mo. Ct. App. 2015) (citation omitted).

Nautilus has carried that burden. It has shown that its contract did not reach any cause of action that could have arisen from the underlying allegations against Industrial Demolition.

Several aspects of the underlying complaint are easily disposed of. For instance, Nautilus argues that three of the five underlying theories—those concerning fraudulent conveyances, (*see* ECF No. 1-3 at 26–29)—involve "no affirmative action on [Industrial Demolition's] part," (ECF No. 26-1 at 9), and are irrelevant to the question of coverage, (*see id.* at 12). Because Industrial Demolition offers no response, it is deemed to have abandoned any argument it might have offered on that score, *cf. Albero v. Worcester Cnty. Bd. of Comm'rs*, Civ. No. 24-1100-JKB, 2025 WL 462588, at *12, 17 (D. Md. Feb. 11, 2025), and those theories (plus any associated allegations) drop out of the analysis. Nautilus also argues that nothing in the underlying complaint suggests property damage due to a "pollution condition." (ECF No. 26-1 at 15.) Industrial Demolition again offers no response, noting the pollution liability policy only in passing. (*See* ECF No. 28 at 11, 15–16.) It abandons any argument it had about duties under that specific provision, too.

On the remaining aspects of the underlying complaint (the CGL and professional liability policies, along with the breach-of-contract claim, the civil conspiracy claim, and the allegations in support of each) the call is closer. But the Court is persuaded that the allegations did not raise any possibility of coverage, leaving Nautilus without any duty to defend—nor, *a fortiori*, any other duty—in the underlying litigation.

Start with the CGL policy. Nautilus maintains that the CGL policy does not apply in part because there was no "occurrence." It insists that, because the policy defines "occurrence" as an

"accident," (ECF No. 1-2 at 35), any claim under the CGL policy "must result from a fortuitous event that was not anticipated or controlled by the policyholder." (*See* ECF No. 26-1 at 14.) In its view, "[b]reaching a contract is neither accidental nor fortuitous," as the performance of a contract is always "within the control of the policyholders." (*Id.*)

Nautilus is correct that, "under Missouri law, a lawsuit seeking damages caused by breach of contract does not state an 'occurrence.'" *Secura Ins. v. Horizon Plumbing, Inc.*, 670 F.3d 857, 862 (8th Cir. 2012) (collecting cases). As Missouri courts have explained,

> [i]t is not the function of the CGL policy to guarantee the technical competence and integrity of business management. The CGL policy does not serve as a performance bond, nor does it serve as a warranty of goods or services. It does not ordinarily contemplate coverage for losses which are a normal, frequent or predictable consequence of the business operations. Nor does it contemplate ordinary business expenses, or injury and damage to others which results by intent or indifference.

*Mathis*, 974 S.W.2d at 649 (quoting James T. Hendrick & James P. Wiezel, *The New Commercial General Liability Forms*, 36 Fed'n Ins. & Corp. Couns. Q. 319, 322 (Summer 1986)). Those courts have held that "a breach of a defined contractual duty" is not an "accident," as the "[p]erformance of [a] contract according to the terms specified therein" is "within [the insured's] control," such that its "failure to perform cannot be described as an undesigned or unexpected event." *Id.* at 650.

At the same time, Nautilus omits to mention the "well-settled Missouri law that when a liability policy defines occurrence as meaning accident," that policy reaches injuries "caused by the negligence of the insured." *Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 393 (Mo. Ct. App. 2007) (citation and internal question marks omitted); *see Wood v. Safeco Ins. Co. of Am.*, 980 S.W.2d 43, 49–50 (Mo. Ct. App. 1998) (collecting cases). For insurance purposes, "[a]n 'accident' is not necessarily a sudden event; it may be the result of a process." *Assurance Co. of Am. v. Secura Ins. Co.*, 384 S.W.3d 224, 234 (Mo. Ct. App. 2012) (citation omitted). "The determinative inquiry into whether there was an 'occurrence' or 'accident' is whether the insured

29

foresaw or expected the injury or damages." *Id.* (citation omitted).

The Court does not take these lines of authority to be in tension with each other. Rather, it takes them to state two distinct but related rules. Where the source of the damages is a breach—a deviation from the expectations memorialized in a contract—there is no "occurrence," even if the breach was caused by an insured's negligence in performing its duties. *See, e.g., Columbia Mut. Ins. Co. v. Epstein,* 239 S.W.3d 667, 672 (Mo. Ct. App. 2007). But where damages arise (or could arise) from an insured's freestanding negligence, beyond or unrelated to the terms of the contract, there *is* an "occurrence." *See, e.g., Stark Liquidation,* 243 S.W.3d at 393.

To decide the category into which a particular claim or set of claims falls, Missouri courts consider factors like whether there is unintended damage to property *other* than that (if any) at issue in the agreement, *see, e.g., Mathis,* 974 S.W.2d at 650, and which cause of action—breach, negligence, or both—is (or could be) supported by the facts and allegations, *see, e.g., Assurance Co.,* 384 S.W.3d at 234; *Davis v. Barton Mut. Ins. Co.,* 549 S.W.3d 472, 477–78 (Mo. Ct. App. 2017); *Columbia Mut.,* 239 S.W.3d at 672.

Industrial Demolition argues that, despite the underlying plaintiff not pleading a tort cause of action, the underlying allegations raise the specter of negligence (and therefore the possibility of CGL coverage). (*See* ECF No. 28 at 12–14.) It points to words like "defective" and phrases like "should have known." (*Id.* at 14; *see also* ECF No. 1-3 at 12, 19, 22.) Given that the duty to defend attaches to the mere *possibility* of coverage, *Bryers,* 512 S.W.3d at 31, language like this could be enough, in theory, to put an insurer on notice of potential liability for accidental harms (assuming that the harms could otherwise support a claim for negligence within the scope of the policy). *See, e.g., Scottsdale Ins. Co. v. Ratliff,* 927 S.W.2d 531, 532, 534 (Mo. Ct. App. 1996).

But that conclusion is not warranted here. The nub of the underlying allegations is that the

30

damages were caused by fundamentally contractual errors, not freestanding negligence. After all, damages from excess and unnecessary dredging are clearly contractual—a conclusion made all the more obvious by the express language of the underlying complaint. (*See, e.g.*, ECF No. 1-3 at 31 (citing "cost overrun[s]" and "overage charges," terms that lack meaning except in reference to an agreed-upon price).) Industrial Demolition does not dispute this, and instead rests its claims of CGL coverage on the sole remaining allegation of damages: those caused by the loss of use of the on-site landfills. (*See* ECF No. 1 ¶ 59; ECF No. 28 at 12–14.)

Yet that allegation suffers from the same problem.[17] Industrial Demolition says that the loss-of-use damages are outside the ambit of the contract and therefore cannot be breaches (which, in turn, preserves their ability to be "occurrences"). (ECF No. 28 at 13–14.) And it may well be true that Industrial Demolition's landfill use was not governed by the dredging agreement; the allegations are not clear on this point. (*See* ECF No. 1-3 at 16, 18, 22–23, 31, 33, 36, 39, 41.) But it was surely governed by *some* agreement. (*See id.* at 16 (referring to the underlying plaintiff's choice "to allow [one of Industrial Demolition's codefendants] to use [the plaintiff's] landfill sites to dispose of excess dredging materials"); *id.* at 41 ("In addition, . . . Industrial Demolition knew that [the plaintiff] would allow, and in fact did allow, . . . Industrial Demolition to dispose of the [e]xcess [m]aterial at [the plaintiff's] landfills.").) And under Missouri law, harm that results from thwarted contractual expectations—even if the precipitating act was negligent, not intentional—is not an "occurrence." *See, e.g.*, *Mathis*, 974 S.W.2d at 650; *Columbia Mut.*, 239 S.W.3d at 672.

---

[17] Nautilus argues that the Court need not even reach the "occurrence" question because there is no "property damage" at issue. (*See* ECF No. 26-1 at 13–14.) But Nautilus itself concedes that Industrial Demolition's alleged disposal of excess material in the on-site landfills "arguably implicate[s] 'property damage' in the form of loss of use." (ECF No. 26-1 at 13.) It then contends that, regardless, coverage is unavailable because the complaint "does not assert a *claim* for 'property damage.'" (ECF No. 26-1 at 13–14 (emphasis added).) Given the multiple allegations of loss of landfill airspace, (*see, e.g.*, ECF No. 1-3 at 18, 22–23, 31, 33, 36, 39, 41), this argument is nothing more than the sort of label-based appeal that Missouri law disdains. *See Spirco Env't*, 555 F.3d at 640–41; *Mo. Terrazzo*, 740 F.2d at 650.

This result "comports with a reasonable person's expectation of liability coverage," as, at bottom, a liability policy "is designed to protect the insured from *fortuitous* injury caused by his actions." *Wood*, 980 S.W.2d at 50 (emphasis added) (citation omitted). Damages flowing from a breach can scarcely be described as "undesigned" or "unexpected" if they are the foreseeable, even if accidental, result of poor performance. *See Mathis*, 974 S.W.2d at 650; *Horizon Plumbing*, 670 F.3d at 862–63. Put another way, a contract for services embraces and subsumes certain forms of negligent conduct—in particular, acts that are the subject matter of the agreement. *See Horizon Plumbing*, 670 F.3d at 862–63; *Columbia Mut.*, 239 S.W.3d at 672. The contracting parties agree that contractual remedies are the appropriate relief for another's failure to perform as expected— and, accordingly, a right of action in negligence is available for only that conduct that "goes beyond the performance of the contract . . . and creates a condition that is wholly unrelated to, collateral [to], or independent of" the same. *Grus v. Patton*, 790 S.W.2d 936, 942–44 (Mo. Ct. App. 1990); *see also Ryann Spencer Grp., Inc. v. Assurance Co. of Am.*, 275 S.W.3d 284, 290 (Mo. Ct. App. 2008) ("The mere failure to perform a contract cannot serve as the basis of tort liability . . . ."); *Business Men's Assurance Co. of Am. v. Graham*, 891 S.W.2d 438, 453 (Mo. Ct. App. 1994) ("If the duty arises solely from the contract, the action is contractual.").

The underlying complaint offers "no allegation of any independent, collateral, or unrelated negligence or carelessness." *Grus*, 790 S.W.2d at 943. All alleged damages arise from Industrial Demolition's failure to perform some agreed-upon duty, whether it was to dredge only a certain amount of material or to dispose of no more than what was supposed to have been dredged. (*See* ECF No. 1 ¶ 59.) That renders the allegedly harmful acts breaches, not torts—and therefore not "occurrences." *See, e.g., View Home Owner's Ass'n v. Burlington Ins. Co.*, 552 S.W.3d 726, 731

(Mo. Ct. App. 2018). The CGL policy could not have applied.[18]

Next, the professional liability coverage. Rather than an "occurrence," this requires "an actual or alleged act, error or omission in [Industrial Demolition's] performance of professional services," (ECF No. 1-2 at 18), where "professional services" refers to "those services performed by [it] or on [its] behalf, that are related to [its] practice as an engineer, consultant, architect, or surveyor that are performed for others for a fee," (*id.* at 36).

Industrial Demolition argues that, per the ordinary meanings of "engineer" and "dredging," the contract embraces the underlying work that it performed. (*See* ECF No. 28 at 10–11.) Nautilus, however, contends that the policy needs more than a mere tangency with a "skilled professional service"; instead, the insured must have used "mental and/or intellectual skills and qualifications," rather than "physical labor," when it committed the allegedly harmful acts. (*See* ECF No. 33 at 5–6.) And by that definition, Nautilus argues, carrying out another firm's dredging plan would not implicate coverage. (*See id.* at 6.)

Whether an act results from a professional service depends "on the act itself," not the place where the act occurred, nor the title of the actor. *Newland v. Azan*, 957 S.W.2d 377, 379 (Mo. Ct. App. 1997); *cf. Am. Econ. Ins. Co. v. Jackson*, 476 F.3d 620, 625 (8th Cir. 2007). A professional act is one that arises out of "a vocation, calling, occupation or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual rather than physical or manual." *Shelter Ins. Cos. v. Hildreth*, 255 F.3d 921, 925 (8th Cir. 2001) (citation omitted); *accord Am. Econ. Ins. Co.*, 476 F.3d at 625; *see also Professional*, Black's Law Dictionary (12th ed. 2024) ("Of, relating to, or involving a job that requires special education and

---

[18] Had Industrial Demolition not already abandoned its argument on that score, the occurrence-based rationale would also preclude application of the pollution liability policy. (*See* ECF No. 1-2 at 16.)

training."); *cf.* Mo. Rev. Stat. § 356.021 (defining "professional services," for purposes of state corporate law, as "[a]ny service that lawfully may be rendered only by persons licensed under the provisions of a licensing law of this state," then listing various learned occupations, including engineers, attorneys, and physicians).[19]

Here, the professional liability policy covers only those acts committed while practicing engineering, consulting, architecture, or surveying. (ECF No. 1-2 at 36.)  Both parties agree that, of the four trades, only engineering is plausibly relevant. (*See* ECF No. 26-1 at 16; ECF No. 28 at 10–11; ECF No. 33 at 5–6.)  So, for coverage to have been triggered, the underlying allegations must show a possibility that Industrial Demolition was using "specialized knowledge, labor, or skill[s]" associated with the engineering profession, and that it was doing so in a "predominantly mental or intellectual" manner. *Hildreth*, 255 F.3d at 925.

But the allegations indicate no such possibility, and accordingly, no concomitant duty to defend.  Instead, they reveal that it was EnviroAnalytics, not Industrial Demolition, that was hired for its professional services,[20] while Industrial Demolition was hired solely to "implement" the

---

[19] To define "professional services," Missouri's courts have themselves looked to the decisions of other jurisdictions, *see, e.g.*, *Newland*, 957 S.W.2d at 379; *Lincoln Cnty. Ambulance Dist. v. Pac. Emps. Ins. Co.*, 15 S.W.3d 739, 744 (Mo. Ct. App. 1998), to relevant statutes, *see, e.g.*, *Roeder v. Ferrell-Duncan Clinic, Inc.*, No. 103CC0497, 2003 WL 21976388, at *5 (Mo. Cir. Ct. Aug. 11, 2003) (citing section 538.205(5) of the Missouri Revised Statutes), and even to the dictionary, *see, e.g.*, *Lincoln Cnty. Ambulance Dist.*, 15 S.W.3d at 744.

[20] The allegations on this point are numerous. (*See, e.g.*, ECF No. 1-3 at 2 (referring to EnviroAnalytics as the "entity engaged to manage the project"); *id.* at 5 (describing it as a "consultant"); *id.* at 7 (alleging that it was meant to keep "watch" over Industrial Demolition); *id.* at 8 (calling it a "professional environmental consultant and project manager" and alleging that its job was "to properly manage the project and the vendors performing the actual environmental remediation work"); *id.* at 14 (alleging that it "was responsible for providing environmental remediation oversight and overall project management for environmental services"); *id.* at 14–15 (alleging that its work included, among other things, "daily observations and measurements"; "overall project management"; "site investigations," to include "soil and groundwater sampling"; "site-wide investigations and monitoring of environmental conditions"; "groundwater discharge, treatment, and monitoring activities"; "landfill monitoring and maintenance obligations"; and "preparation, recording, modification, [and] implementation of environmental response and development work plans," to include "institutional and engineering controls"); *id.* at 15 (alleging that it "maintained a special relationship and intimate nexus" with the underlying plaintiff and "knew that [the plaintiff] was relying on [it] to properly perform its professional project management services," including "managing its vendors and preventing them from taking on non-essential tasks"); *id.* at 16 (alleging that it "agreed to the administration, coordination, management, and supervision of the environment remediation oversight and project management for environmental services work . . . in a manner consistent with the degree of skill and care ordinarily used by similar management professionals"); *id.* at 18 (alleging

"various dredging, maintenance, and site cleanup" plans that EnviroAnalytics had devised. (ECF No. 1-3 at 17; *accord id.* (alleging that Industrial Demolition was paid on a time-and-materials basis "subject to [EnviroAnalytics'] approval and management"); *id.* at 22 (alleging that "additional and unnecessary" dredging was completed by Industrial Demolition "on behalf of" EnviroAnalytics); *id.* at 30 (alleging that EnviroAnalytics hired Industrial Demolition "to perform" the dredging); *id.* at 32 (alleging that EnviroAnalytics owed a duty "to ensure that Industrial Demolition was completing" the dredging "consistent with" the cleanup plan "and in accordance with accepted industry practices and standards").) And even if "dredging," by some definitions, means "an operation *under the branch* of 'civil engineering,'" (ECF No. 28 at 11 (emphasis added) (citation omitted)), that does not entail that all dredging is an *act* of civil engineering. *Cf. Gen. Cas. Co. of Wisc. v. Nelson Eng'g Consulting, LLC*, 91 F. Supp. 3d 1168, 1175–76 (D.S.D. 2015) (explaining that a general contractor "may have had obligations relating to the construction of [a] plant that did not involve specialized skill or were not primarily intellectual"). Indeed, to the extent the allegations discuss Industrial Demolition's role at all, they reveal it to be a basically physical one (digging and hauling), not a "predominantly mental or intellectual" one using the "specialized knowledge, labor, or skill[s]" of an engineer. *See Hildreth*, 255 F.3d at 925. That puts the work outside the ambit of the professional liability policy. *Cf. Savers Prop. & Cas. Ins. Co. v. Rockhill Ins. Co.*, No. 21-cv-01802, 2022 WL 9461874, at *5 (S.D. Ind. Oct. 14, 2022) (holding, under the same definition of "professional service," that "the simple act of improperly covering . . . waste with dirt . . . would clearly be unsophisticated manual labor and [not] a professional service").

Because there was no "occurrence," coverage was unavailable under the CGL and pollution

---

that the "scope and parameters" of the project, including "the depth to which the canal was to be dredged," were "detailed and provided in" the master cleanup plan, which "was prepared by [EnviroAnalytics] and its agent," which was not alleged to have been Industrial Demolition); *id.* at 33 (alleging that EnviroAnalytics "fail[ed] to perform its duty to exercise reasonable skill and judgment and to apply industry standards in the management" of the project).)

liability policies. And because the alleged damages did not flow from a "professional service," there was no coverage under the professional liability policy, either.[21] All claims against Nautilus will be dismissed.

### C.    EnviroAnalytics' Bad-Faith & Vexatious-Refusal Claims Against AXIS Will Be Dismissed.

Having resolved Industrial Demolitions' claims against Nautilus, the Court turns now to AXIS's motion. Upon the dismissal of Count I, *see supra* Section IV.A, the remaining claims AXIS seeks to dismiss are Counts IV (bad-faith failure to settle) and V (vexatious refusal to pay).

Quite apart from the prior contract, the AXIS-EnviroAnalytics contract contains a choice-of-law clause that selects New York law to resolve any dispute "over the meaning, interpretation or operation of any term, condition, definition or provision of [that] [p]olicy." (ECF No. 1-1 at 31.) AXIS argues that this should be honored, and that, under New York law (as well as on other grounds), Counts IV and V are unsustainable. (*See* ECF No. 25-1 at 4–8.) But EnviroAnalytics insists that the clause is unenforceable, and that, in its absence, the law of Missouri applies—law that EnviroAnalytics believes is more hospitable to its claims. (*See* ECF No. 29 at 5–15.)

The Court agrees with AXIS, and accordingly, EnviroAnalytics' bad-faith and vexatious-refusal claims against AXIS will be dismissed. Below, the Court will set out the choice-of-law rules applicable to contracts that contain choice-of-law provisions. It will use those rules to explain why New York law applies in this case. And it will apply that law to the two claims at issue.

#### 1.    Choice-of-Law Rules for Contracts with a Choice-of-Law Clause.

Once again, the Court begins with the choice-of-law rules of Maryland. *See Volvo Constr. Equip.*, 386 F.3d at 600–01.

---

[21] Given that coverage was unavailable under the facial provisions of the relevant policies, the Court need not address Nautilus's arguments about those policies' express exclusions. (*See* ECF No. 26-1 at 14–16.)

When a contract contains a choice-of-law provision, Maryland courts generally apply the law of the chosen jurisdiction. *Cunningham*, 107 A.3d at 1204. The extent to which they disregard that choice turns on the nature of what, exactly, was chosen.

If a choice-of-law provision would lead to the application of a legal rule that could have been spelled out in the contract, Maryland courts will generally apply that rule. *See Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803–04 (Md. 2007) (citing Second Restatement § 187(1)). For example, rather than identifying a specific interest rate, contracting parties might say something to the effect of "the highest rate permitted by the law of jurisdiction X." *See id.* at 803 n.2. Because that rate could have been written into the agreement—a rate being more akin to a term or condition, *see, e.g.*, Second Restatement § 187, cmt. c, than to a structural prerequisite, like one's capacity to contract, *see, e.g., id.* § 187, cmt. d—it will ordinarily be enforced. Maryland courts decline to apply legal rules like these only when a rule would not have been permitted as a contractual term—*i.e.*, when the effect of the rule would be contrary to the law of the place whose law would otherwise govern that issue.[22] *See Pasadena Receivables*, 921 A.2d at 803 & n.2 (citing Second Restatement § 187, cmt. c). So, if "the highest rate permitted by the law of jurisdiction X"

---

[22] EnviroAnalytics argues, based on the commentary to section 187, that whether a term could have been spelled out explicitly is answered by the "law of the state selected by application of the rule of § 188." (ECF No. 29 at 7 (quoting Second Restatement § 187, cmt. c)). Section 188 requires courts to apply the law of the state with the "most significant relationship" to the transaction and the parties. *See* Second Restatement § 188(1).

But section 188 is inapplicable here. To be sure, EnviroAnalytics is right about what the commentary says. And section 187—the provision, not the commentary—does refer to section 188 for the sake of determining what law applies absent the parties' contractual choice. *See* Second Restatement § 187(2)(b). Even so, the Maryland Supreme Court has expressly disavowed this reference to section 188. *See Pasadena Receivables*, 921 A.2d at 804 n.3 ("Our adherence to § 187(2) is tempered by the fact that Maryland has not adopted the 'most significant relationship' test stated in § 188 . . . but has [instead] maintained its allegiance to the *lex loci contractus* principle. That does not affect our adherence generally to § 187(2)." (internal citation omitted)); *Am. Motorists*, 659 A.2d at 1301 ("Despite growing acceptance elsewhere, Maryland courts have never applied the 'most significant relationship' test embodied by the Restatement."). And it is implausible that the court would disavow the most-significant-relationship test for purposes of section 187's substance but not its commentary.

Accordingly, it is the *lex loci contractus*—subject to two narrow exceptions, *see supra* Section IV.B.1—that applies to both the substance of the dispute, absent a contractual choice, and the question of whether a term could have been spelled out expressly (for purposes of determining the trajectory of the section 187 analysis).

permits an interest rate higher than the maximum allowed under the law that would otherwise

apply (in most cases, the *lex loci contractus*), that term could not have been added to the contract,

and Maryland courts would refuse to enforce it (by way of declining to honor the parties' choice

of law as to that particular rule). *See id.* Because this approach is essentially a "rule providing for

incorporation by reference and . . . not a rule of choice of law," Second Restatement § 187, cmt. c,

Maryland courts follow it even when the chosen jurisdiction otherwise bears no relationship to the

parties or the transaction. *See Pasadena Receivables*, 921 A.2d at 803.

Alternatively, even if a choice-of-law provision would lead to the application of a legal rule

that could *not* have been spelled out, Maryland courts will still enforce it unless (a) the chosen

jurisdiction (i) bears "no substantial relationship to the parties or the transaction" and (ii) lacks

some "other reasonable basis" for having been chosen, or (b) the law of that jurisdiction would be

contrary to the strong public policy of another jurisdiction with a "materially greater interest" in

the controversy and whose law would apply absent the parties' choice. *See Pasadena Receivables*,

921 A.2d at 803–04 (quoting Second Restatement § 187(2)(b)). The place whose law would apply

absent the contractual choice is, of course, the *locus contractus*, subject to the exceptions described

above.[23] *See id.* at 804 n.3; *supra* Section IV.B.1. And the public-policy analysis in contractual

choice-of-law cases is the same as that in basic *lex loci contractus* cases. *Cunningham*, 107 A.3d

at 1212 (citing *Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 650 A.2d 246, 250 n.4 (Md. 1994)).[24]

In general, a choice-of-law clause that would lead to the application of an against-public-

policy rule on one issue is not void as to *all* such rules that would be applied under that provision.

---

[23] Like EnviroAnalytics, *see supra* note 22, AXIS argues that section 187(2)(b) uses the "most significant relationship" test to determine whose law would otherwise apply. (ECF No. 32 at 7.) But again, Maryland courts have expressly disavowed that test—and have done so in precisely the same context in which AXIS argues it applies. *See Pasadena Receivables*, 921 A.2d at 804 n.3; *Am. Motorists*, 659 A.2d at 1301.

[24] This departs from the approach of the Second Restatement, which sets the bar for a public-policy exception in the contractual-choice context *lower* than in the basic *lex loci contractus* context. *See* Second Restatement § 187, cmt. g.

*See Pasadena Receivables*, 921 A.2d at 803–04 (quoting section 187's references to "the particular issue" in determining whether a choice-of-law clause ought to apply). Courts honor the parties' choice to the extent that they can, declining to enforce it only insofar as the selection leads to an impermissible result (*i.e.*, on a rule-by-rule basis). *Cf. Erie Ins. Exch. v. Heffernan*, 925 A.2d 636, 620–21 (Md. 2007) (embracing *dépeçage*, a doctrine under which different substantive issues— *e.g.*, tort issues and contract issues—are governed by the substantive law of different jurisdictions).

Still, while an issue-by-issue approach is the general rule, the nature of the claims in *this* case limits the extent to which the Court follows that approach here. This Court has "repeatedly held that[,] under Maryland's choice of law rules, the law that governs a bad faith claim is the same law that governs the insurance contract from which the claim of bad faith arises." *Fogarty v. Allstate Ins. Co.*, Civ. No. 04-414-CCB, 2011 WL 1230350, at *7 (D. Md. Mar. 30, 2011). For it to hold otherwise "would be unnecessarily confusing and would subject [insurers] to potentially conflicting standards of conduct." *Lafarge Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 935 F. Supp. 675, 692 (D. Md. 1992). That logic applies with even greater force to a claim for vexatious refusal damages, which, unlike the tort of bad faith, is "derivative of a breach-of-contract claim." *Acad. Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 777 (8th Cir. 2024) (citation omitted); *see* Mo. Rev. Stat. § 375.420 (authorizing additional damages "[i]n any action against any insurance company to recover the amount of any loss under a policy of [certain kinds of] insurance"). Absent a choice-of-law provision to the contrary, the Court will not take the parties to have desired their contract to be carved up and examined under the laws of different jurisdictions, at least with respect to claims as closely related as these.

2. New York Law Governs EnviroAnalytics' Remaining Claims Against AXIS.

To decide whether to honor the parties' choice of New York law, the Court looks first to

subsection 187(1) of the Second Restatement. That provision requires courts to apply choice-of-law clauses, without exception, so long as they point to rules that could have been spelled out expressly. *See* Second Restatement § 187(1).

Here, the issues in dispute are whether EnviroAnalytics has stated—or even *can* state—a claim of bad-faith failure to settle or an entitlement to vexatious-refusal damages. (*See* ECF No. 25-1 at 4–8.) The relevance of a choice-of-law clause to those issues is the selection of a body of law against which to assess the legal and factual sufficiency of the pleadings.

Contrary to what AXIS contends, (*see* ECF No. 32 at 3), that sort of selection lies at the heartland of issues that cannot be determined by express agreement. After all, subsection 187(1) "is a rule providing for incorporation by reference *and is not a rule of choice of law*." *See* Second Restatement § 187, cmt. c (emphasis added). It embraces only those choices that concretize the parties' well-defined, mutual expectations; it does not embrace those that seek to contract the answers to complicated legal-analytical questions. *See, e.g.*, *Carmel Fin., LLC v. Schoenmann*, 622 F. Supp. 3d 830, 845–46 (N.D. Cal. 20202); *Lifestyle Improvement Ctrs., LLC v. East Bay Health, LLC*, No. 13-cv-735, 2013 WL 5564144, at *6–7 (S.D. Ohio Oct. 7, 2013). To enjoy the subsection's "complete deference" to a choice of law, *see Carmel Fin.*, 622 F. Supp. 3d at 845, the parties must not seek "to accomplish by choice of law what they could not accomplish by contract." *See Lifestyle Improvement Ctrs.*, 2013 WL 5564144, at *6. It would run counter to the purpose of that provision—not to mention be absurd—to hold that the parties had incorporated by reference all of New York law on the sufficiency of a bad-faith claim (or any other claim), then hold on that

40

basis that the issue is one that the parties could have decided explicitly.[25]  The issue is for the Court to decide.  Subsection 187(1) does not apply.

That leaves only subsection 187(2).  That provision requires courts to apply choice-of-law clauses unless either one of two exceptions is met.  *See Pasadena Receivables*, 921 A.2d at 805.

Here, neither is satisfied.  The first is not met because the parties had a reasonable basis for choosing New York law.  As to the second:  Missouri law would apply absent the parties' choice. Because a bad-faith claim is not supported under either Missouri or New York law, Count IV will be dismissed.  And despite New York law not recognizing vexatious-refusal damages, applying it here would not affront a strong public policy of Missouri.  Count V will be dismissed, too.

> i.       *The Parties Had a Reasonable Basis for Selecting New York Law.*

Start with the first exception, which concerns choices of law that (i) bear "no substantial relationship to the parties or the transaction" *and* (ii) lack some "other reasonable basis" for having been chosen.  Second Restatement § 187(2)(a).  A "substantial relationship to the parties or the transaction" is enough to escape both elements.  *Id.* § 187, cmt. f.  But even if a jurisdiction lacks a "substantial relationship," "[t]here are undoubtedly still other situations where the state of the chosen law will have a sufficiently close relationship to the parties and the contract to make the parties' choice reasonable."  *Id.*

The Court assumes that no substantial relationship exists between New York and the parties or the transaction.  New York is neither the place of incorporation nor the base of operations for either EnviroAnalytics or AXIS.  It has no connection to the underlying events or litigation.  And AXIS's contention that the mere possibility of having to defend and indemnify claims brought in

---

[25] Even if the parties could have decided that issue in their agreement, that fact would be of no help here, as the parties disagree about whether EnviroAnalytics has actually stated bad-faith and vexatious-refusal claims.

a court in New York creates a "substantial relationship" to the contract is, in a word, dubious. (*See* ECF No. 32 at 6.) The Court need not decide the issue, though, as again, some other "reasonable basis" for the parties' choice can make up for an insufficiently substantial relationship.

While Maryland caselaw is replete with favorable citations to the reasonable-basis test of subsection 187(2)(a), *see, e.g., Nat'l Glass*, 650 A.2d at 248; *Pasadena Receivables*, 921 A.2d at 804, it has seldom if ever been the fulcrum of a court's choice-of-law ruling. But other courts have applied the test in cases similar to this one, often concluding that the parties' choices of law were reasonable enough not to discount on the basis of the first exception. For example, the Second Circuit recognized as "eminently reasonable" the choice of New York law to govern an agreement "drafted for use throughout the United States." *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 608 (2d Cir. 1996); *accord King v. Bumble Trading, Inc.*, 393 F. Supp. 3d 856, 865 (N.D. Cal. 2019) (holding that the "lenient" reasonable-basis test was satisfied both by the "wide spread" of a nationwide service, which created "an interest in identifying a single body of law to govern . . . users in different states," and by the fact of a "substantial number of New York users"); *cf. Worley Claims Servs., LLC v. Jefferies*, 429 F. Supp. 3d 146, 156 (W.D.N.C. 2019) ("[I]t is reasonable for [plaintiffs] to choose a single state's law . . . to govern its agreements with all these employees rather than research and revise the agreements to comply with each employee's state's law . . . ."). It also nodded to New York's "highly developed body of commercial law." *Valley Juice*, 87 F.3d at 608; *accord Gen. Ret. Sys. of City of Detroit v. UBS, AG*, 799 F. Supp. 2d 749, 757 (E.D. Mich. 2011) ("New York does have a highly developed body of commercial law, so it is reasonable in cases of complex financial transactions for parties domiciled in different states to elect New York law to govern their disputes."); *see also Schroeder v. Rynel, Ltd., Inc.*, 720 A.2d 1164, 1166 (Me. 1998) ("If parties choose a state's laws to govern because of that state's well-

known and established body of law, then a court will enforce that choice of law provision."); *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 325 (Tex. 2014) (similar).

The parties here had a reasonable basis for choosing New York law. First, the policy is drafted for use across the United States. (ECF No. 1-2 at 33.) While that might not be enough to create a "substantial relationship," it does make New York law a more reasonable choice. Second, EnviroAnalytics virtually concedes that New York law is well developed on commercial insurance. (*See* ECF No. 29 at 9 (arguing that AXIS "included this choice of law provision" only "because New York law is uniquely favorable to insurers," then citing to an article explaining why "[m]any" commercial insurers' policies choose New York law).) As AXIS rightly observes, "rarely, if ever, will the parties choose a law without good reason for doing so." (ECF No. 32 at 6 (quoting Second Restatement § 187, cmt. f).) Whether or not EnviroAnalytics is satisfied with its earlier choice is irrelevant to that choice's reasonableness now.

### ii. *Applying New York Law Would Not Be Contrary to the Strong Public Policy of a Materially More Interested Jurisdiction Whose Law Would Otherwise Apply.*

Turn next to the second exception, which concerns choices of law that are contrary to the strong public policy of a jurisdiction with a "materially greater interest" in the dispute and whose law would apply absent the parties' contractual choice. Second Restatement § 187(2)(b).

This inquiry involves three steps. First, the Court ascertains the jurisdiction whose law would apply absent the choice-of-law provision; second, it considers whether applying the chosen law would be contrary to any strong public policy of the jurisdiction whose law would otherwise apply; and third, it asks whether the jurisdiction whose law would otherwise apply has a "materially greater interest" in the determination of the dispute than does the chosen jurisdiction. *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 924 (6th Cir. 2006);

*see Nat'l Glass*, 650 A.2d at 249–51.

Absent the choice-of-law provision, Missouri law would apply. But because a freestanding bad-faith claim is unavailable under both Missouri and New York law, Count IV will be dismissed. Separately, even though New York law does not recognize vexatious-refusal damages, applying it here would not offend a strong public policy of Missouri. It is unnecessary, then, to decide whether Missouri has a "materially greater interest" in the dispute, and Count V will also be dismissed.

        a.      Missouri Law Would Apply in the Absence of the Choice-of-Law Clause.

Step one shows Missouri to be the state whose law would otherwise apply: As explained, Missouri law is the *lex loci contractus* for both agreements. *See supra* Section IV.B.2. Had AXIS and EnviroAnalytics not selected New York, Missouri law would apply unless either (1) a strong public policy of the forum state, Maryland, would oppose it or (2) both of the following are true: (a) the *fora loci contractus* (the courts of Missouri) would apply forum (Maryland) law to the disputed issues and (b) Maryland has at least a "substantial" relationship to the same. *See id.*

Here again, neither exception is satisfied.

As to the first exception: there is no strong Maryland policy against the enforcement of Missouri's vexatious-refusal statute. Courts use the public-policy exception to decline to enforce offensive foreign causes of action; they generally do not use it to abrogate foreign rights. *See* Restatement (First) of Conflict of Laws § 612 (hereinafter "First Restatement"); Second Restatement § 90. As the commentary to the Second Restatement explains, the exception

> has a narrow scope of application. It applies only to situations where the forum refuses to entertain the suit on the ground that the *cause of action* is contrary to a strong local public policy. . . . [It] does not justify striking down a defense good under the otherwise applicable law on the ground that this defense is contrary to the strong public policy of the forum. Such action involves more than a mere denial of access to the court. Rather, it is a preliminary step to the rendition of a judgment on the merits. It involves the application of the local law of the forum to determine

44

the efficacy of a defense and thus to decide the ultimate rights of the parties.

Second Restatement § 90, cmt. a (emphasis added); *accord* First Restatement § 612, cmt. a. Put

another way, it is the *vindication* of a foreign right, not the foreign right itself, that the exception

permits courts to deny.[26] *See Erie Ins.*, 925 A.2d at 653–55 (collecting cases); *Cunningham*, 107

A.3d at 1211–15 (same). So, foreign limits on remedies, which vest in defendants corresponding

rights against certain relief, are not the kind of foreign laws that are amenable to a public-policy

exception—not under the Restatements, anyway, which Maryland courts have repeatedly found

instructive. *See, e.g., Harford Mut. Ins. Co. v. Bruchey*, 238 A.2d 115, 118 (Md. 1968) (citing First

Restatement § 612); *Malik v. Malik*, 638 A.2d 1184, 1190 (Md. Ct. Spec. App. 1994) (citing Second

Restatement § 90). *But cf. Hood*, 911 A.2d at 850–51 (declining to defer to another state's *lack* of

a right of action and instead permitting a foreign defendant to be sued under forum law).

Missouri and Maryland law differ in terms of which mechanism of recovery—bad-faith

failure to settle or vexatious refusal to pay—they support. Missouri courts have explained that the

availability of statutory damages for vexatious refusal preempts the common-law tort of bad faith

with respect to first-party claims (*i.e.*, claims made by an insured against its own insurer). *E.g.,*

*Shafer v. Auto. Club Inter-Ins. Exch.*, 778 S.W.2d 395, 400 (Mo. Ct. App. 1989) (citation omitted);

*see also Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 68–69 (Mo. 2000) (approving lower

courts' holdings "that an insurance company's denial of coverage . . . is actionable *only* as a breach

of contract and, where appropriate, a claim for vexatious refusal to pay" (emphasis added)).[27]

---

[26] Unlike declining to recognize a foreign defense or other limit on liability, which destroys the rights of a defendant, declining to enforce a foreign right of action does not destroy any rights of a would-be plaintiff. It says only that the forum court will not be the one to enforce them. *See, e.g., Bethlehem Steel*, 498 A.2d at 608–10 (declining to enforce a contractual provision that was tolerated under Pennsylvania law but forbidden under Maryland law); *Nat'l Glass*, 650 A.2d at 250 (same).

[27] At least one court has declined to hold that the vexatious-refusal statute preempts the common-law tort of bad faith. *See Axis Specialty Ins. Co. v. N.H. Ins. Co.*, No. 15-809-CV, 2017 WL 343643, at *2 (W.D. Mo. Jan. 23, 2017). That court based its decision on a prior decision of the Missouri Supreme Court stating that the vexatious-refusal statute

Maryland, however, has no statutory damages for insurer misconduct and continues to recognize only the common-law bad-faith tort. *See, e.g., Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1063 (Md. 1999).

It is important to be clear about what this difference means. The two states do not differ over *whether* an aggrieved insured can recover. After all, bad faith and vexatious refusal both protect the rights of insureds against recalcitrant insurers. *See, e.g., Allstate Ins. Co. v. Campbell*, 639 A.2d 652, 658–59 (Md. 1994); *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 457–58 (Mo. 2006). And Missouri courts have held that vexatious refusal damages are the successor to the common-law tort of bad faith. *See Shafer*, 778 S.W.2d at 400. Instead, the difference lies in what recovery the two states permit. An award for vexatious refusal is more limited than that for the tort of bad faith, which permits a "broader vista of damages." *Shafer*, 778 S.W.2d at 400 (citation omitted). While Maryland authorizes bad-faith damages in the amount by which a judgment, rendered after an insurer's refusal to settle, exceeds coverage limits, *Kremen v. Md. Auto. Ins. Fund*, 770 A.2d 170, 177 (Md. 2001), Missouri authorizes vexatious-refusal penalties "not to exceed twenty percent of the first fifteen hundred dollars of the [underlying] loss, and ten

---

"does not displace or preempt any remedies[,] nor does it provide an immunity from liability," and that "[t]here is not one word in the statute to support the notion that [it] 'preempts' any claim." *Id.* (quoting *Overcast*, 11 S.W.3d at 69).

This Court reads *Overcast* differently. That decision was about whether the vexatious-refusal statute overrode common-law actions for breach and defamation, not bad faith. *See* 11 S.W.3d at 66 ("[T]he language of the statute does not purport to preempt the common law breach of contract remedy . . . ."); *id.* at 67 ("No tort claim has supplanted or supplemented the basic contract claim and remedy where an insurance company wrongfully refuses to pay a loss incurred by its own insured."). Indeed, between the two sentences quoted in *Axis Specialty Insurance*, the *Overcast* court itself stated that the vexatious-refusal statute "leaves in place the common law contract remedy." *See id.* at 69. Tellingly, while the *Overcast* court described four lower-court decisions as having held, "[w]ithout much analysis," that vexatious refusal preempted bad faith, *id.* at 68, it later described those decisions as "*correctly* h[olding] that an insurance company's denial of coverage itself is actionable *only* as a breach of contract and, where appropriate, a claim for vexatious refusal to pay," *id.* at 69 (emphasis added). It then noted, with seeming approval, that the lower courts did "not go beyond th[at] narrow decision to say that *all* torts"—*i.e.*, those other than bad faith—were barred, whether or not those torts arose from the denial itself or from related conduct. *See id.*

Given the four intermediate appellate decisions squarely holding as much, followed by the apparent approval of the state supreme court, this Court is persuaded that a standalone tort of bad faith is no longer available in Missouri.

percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee," Mo. Rev. Stat. §§ 375.420. From Maryland's perspective, then, the vexatious-refusal statute does no more than impose a different limit on a plaintiff-insured's potential damages—and, by extension, on a corresponding right of a defendant-insurer to be shielded from recoveries above that amount. It is not an offensive right of action—or a right of action at all—that Maryland courts might legitimately decline to entertain.

Even if the vexatious-refusal statute were the *sort* of law that a jurisdiction would decline to enforce on public-policy grounds, it is hardly clear that Maryland has a strong enough public policy to do so. Again, it is not enough that a foreign remedy be merely different from the law of the forum; any contrary policy must be "very strong indeed" for the exception to apply. *Erie Ins.*, 924 A.2d at 654 (citation omitted). Neither AXIS nor EnviroAnalytics addresses this issue. But given the unity of purpose among bad faith and vexatious refusal, *see supra*, the Court is strongly disinclined to think Maryland's courts would decline to recognize the latter. *See* First Restatement § 612, cmt. a ("The [exception] . . . is applicable when *the entire basis of the claim upon which suit is brought* is so contrary to the public policy of the forum that it will withhold altogether the use of its courts to enforce the claim." (emphasis added)).

And as for the second exception: Missouri courts would apply Missouri law, not Maryland law, to the dispute. As explained, Missouri courts use the Second Restatement's "most significant relationship" test to resolve choice-of-law problems. *See supra* Section IV.B.2. With respect to the Nautilus–Industrial Demolition policy, that test strongly favored Missouri law. *See id.* Yet all the same factors that favored Missouri in the earlier matchup—namely, that Missouri was where the policy was delivered and paid, (ECF No. 1-1 ¶¶ 14–15), as well as the place of incorporation and base of operations of the relevant Policyholder, (*id.* ¶ 5)—likewise favor it here. The only

47

difference is that the relevant Insurer, AXIS, is incorporated in Illinois and based in Georgia, (*id.* ¶ 7), unlike Nautilus, which is incorporated and based in Arizona, (*id.* ¶ 8). For the same reason these locations did not move the needle before, they do not move it now. *See supra* note 13.

Because neither exception to *lex loci contractus* applies, Missouri law would control in the absence of the choice-of-law clause.

> b.    Applying New York Law Would Not Offend a Strong Public Policy of Missouri.

Now that the Court has narrowed the relevant states to Missouri and New York, it proceeds to step two. This step asks whether applying New York law (the parties' choice) would offend a strong public policy of Missouri (whose law would otherwise apply). *See DaimlerChrysler*, 448 F.3d at 924; *Nat'l Glass*, 650 A.2d at 249–50.

It would not. Before deciding that issue, however, it is necessary to consider the differences (and similarities) between the two jurisdictions' laws on the claims at issue. That consideration informs the scope of any public-policy analysis.

No such analysis is needed for the bad-faith claim. New York and Missouri law each lead to the same result: dismissal. Again, in Missouri, first-party claims of recalcitrant conduct by an insurer must take the form of a claim for vexatious-refusal damages, which replaced the common-law bad-faith tort. *Shafer*, 778 S.W.2d at 400 (citation omitted); *see Overcast*, 11 S.W.3d at 69. *But see Sprint Lumber*, 627 S.W.3d at 119. New York does not recognize a freestanding bad-faith tort, either. *Schlusselberg v. N.Y. Cent. Mut. Fire. Ins. Co.*, 169 N.Y.S.3d 657, 659 (N.Y. App. Div. 2022); *Wiener v. Unumprovident Corp.*, 202 F. Supp. 2d 116, 123–24 (S.D.N.Y. 2002). Yet that is precisely what is pressed in Count IV. (ECF No. 1 ¶¶ 160–69.) Because both Missouri and New York law require dismissal, the bad-faith claim presents a "false conflict," *see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 838 & n.20 (1985) (Stevens, J., concurring), and there is no need for

any further choice-of-law analysis, much less a public-policy analysis, on it. *See Perini/Tompkins*, 738 F.3d at 101 ("[C]hoice of law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes . . . ."). Count IV will be dismissed.

The vexatious-refusal claim is different. The false-conflict offramp is unavailable because, simply, vexatious-refusal damages are alien to New York law. *See Maritz Holdings Inc. v. Certain Underwriters at Lloyd's London*, No. 18-CV-825, 2020 WL 7023952, at *2–4 (E.D. Mo. Nov. 30, 2022). If New York law applies, such damages are precluded, but if Missouri law applies, the prayer for that relief can proceed (provided, of course, that EnviroAnalytics has sufficiently stated its entitlement to it). This determination requires a public-policy analysis.

Missouri has no strong public policy against the application of New York law in this case. Whatever differences there may be between the two states' laws, at bottom, each offers a means of protecting insureds against intractable insurers. In Missouri, the pathway to recovery is primarily statutory, allowing insureds to recover, as a supplement to damages for breach, a modest amount of the underlying loss and "a reasonable attorney's fee." Mo. Rev. Stat. § 375.420; *see Acad. Bank*, 116 F.4th at 777. And in New York, the pathway is damages available via the common law, in the form either of consequential damages in a breach action, *see Panasia Ests., Inc. v. Hudson Ins. Co.*, 886 N.E.2d 135, 137 (N.Y. 2008), or of punitive damages in a tort action (other than an action for bad faith, which, again, New York does not recognize), *see NYU v. Cont. Ins. Co.*, 662 N.E.2d 763, 767–68 (N.Y. 1995). Both approaches reflect a step back from the recovery that might have been allowed under the common-law tort of bad faith. *See Shafer*, 778 S.W.2d at 400 (citation omitted); *NYU*, 662 N.E.2d at 767–68. This is hardly a circumstance in which one state has utterly disregarded the interests the other has sought to protect, nor one in which one state has permitted something the other has expressly forbidden.

No doubt, the two states may have had somewhat different considerations in mind when developing their policies. *See, e.g., Overcast*, 11 S.W.3d at 67 (observing that the vexatious-refusal statute's attorney-fee award "obviously aim[s] to make the contracting party whole in a practical sense," which is not possible where expectation and consequential damages are the sole remedies); *Pavia v. State Farm Mut. Auto. Ins. Co.*, 626 N.E.2d 24, 28 (N.Y. 1993) (considering, for purposes of articulating a standard for bad-faith consequential damages, "the two-fold goal of protecting *both* the insured's and the insurer's financial interests" (emphasis added)).

But the results of these considerations are not as divergent as EnviroAnalytics makes them out to be. For one, EnviroAnalytics neglects to mention that, in New York, bad-faith damages are recoverable in tort, not just in contract, (*see* ECF No. 29 at 12 & n.2), albeit not on a bad-faith tort as such. For another, it insists that New York law permits bad-faith damages only "upon a showing of *egregious* bad faith." (*Id.* at n.2 (emphasis in original) (citing *Sukup v. State*, 227 N.E.2d 842, 844 (N.Y. 1967)).) Fair enough. *See, e.g., Rocanova v. Equitable Life Assurance Soc'y of U.S.*, 634 N.E.2d 940, 943–44 (N.Y. 1994); *Sukup*, 227 N.E.2d at 844. But the rubric is not so different in Missouri. *See Sprint Lumber*, 627 S.W.3d at 122 (explaining that courts construe the vexatious-refusal statute "strictly, because it is penal in nature" (collecting cases)); *Wood*, 980 S.W.2d at 55 ("The test for a vexatious refusal claim is . . . how willful and unreasonable the insurer's refusal was as the facts appeared to a reasonable and prudent person at the time the insurer was asked for coverage."); *Shirkey v. Guar. Tr. & Life Ins. Co.*, 258 S.W.3d 885, 889 (Mo. Ct. App. 2008) ("[T]he mere fact that a subsequent court decision is adverse to an insurance company's position is not sufficient reason for imposing the penalty [of vexatious-refusal damages].").

Again, the public-policy exception requires more than a bare difference in the potentially applicable laws; it requires "very strong" disagreement with another jurisdiction's "fundamental"

50

policy. *See Erie Ins.*, 924 A.2d at 654; Second Restatement § 187(2)(b).  Regardless of whether Missouri's policy can be described "fundamental,"[28] it is not in such tension with New York law that it requires ignoring that choice.[29]  Simply, "[t]he Court is not persuaded that Missouri public policy was meant to relieve a sophisticated party from its contractual obligations in this manner." *Cf. Foresight Energy, LLC v. Ace Am. Ins. Co.*, 663 F. Supp. 3d 980, 987 (E.D. Mo. 2023).

        c.      The Court Need Not Consider Whether Missouri Has a "Materially Greater Interest" in the Dispute.

Because the Court concludes that applying New York law would not offend a strong public policy of Missouri, it need not engage with the third step of the section 187(2)(b) analysis.  Again, that step asks whether the jurisdiction whose law would otherwise apply has a "materially greater interest" in the determination of the dispute than does the chosen jurisdiction. *DaimlerChrysler*, 448 F.3d at 924; *see Nat'l Glass*, 650 A.2d at 250–51.  If there is no strong policy conflict, that inquiry is unnecessary. *See* Second Restatement § 187(2)(b).

Accordingly, the Court will honor the parties' contractual choice of New York law.

      3.    <u>Under New York Law, EnviroAnalytics Has No Vexatious-Refusal Claim Against AXIS.</u>

Having determined that Count IV, the bad-faith claim, is unsupported under both Missouri and New York law and must be dismissed, *see supra* Section IV.C.2.ii.b, the only remaining claim

---

[28] That Missouri's policy is partly enshrined in statute does not, in and of itself, make it "fundamental" (as opposed to merely "important"). *See Bauer v. Farmers Ins. Co.*, 270 S.W.3d 491, 498 (Mo. Ct. App. 2008).  *But cf. Sturgeon v. Allied Pros. Ins. Co.*, 344 S.W.3d 205, 210 (Mo. Ct. App. 2011) (reading, as a statement of Missouri public policy, a statutory provision that affirmatively called out a disfavored type of contractual provision).

[29] At least one court has held otherwise. *See Maritz Holdings*, 2020 WL 7023952, at *2, 4 (holding that the vexatious-refusal statute reflected the fundamental public policy of Missouri, and that this policy was so strongly opposed to New York's lack of such damages that the court had to ignore the parties' choice of New York law). But again, this Court is not convinced either that the differences between Missouri and New York law are all that large or that New York law would "work[] to strip Missouri insureds of the protections afforded by the vexatious refusal statute," *id.* at *3.  It is not as if New York offers no path to recovery against an uncooperative insurer—indeed, quite the opposite. *See Panasia Ests.*, 886 N.E.2d at 137; *NYU*, 662 N.E.2d at 767–68.

subject to AXIS's motion to dismiss is EnviroAnalytics' vexatious-refusal claim, brought under Count V. (*See* ECF No. 25-1 at 1.)

Under New York law, that claim, too, must fail. Vexatious-refusal damages are a creature of Missouri statutory law. Mo. Rev. Stat. § 375.420. They are not recognized under the law of New York. *See Maritz Holdings*, 2020 WL 7023952, at \*2. Count V will be dismissed.

## V.    CONCLUSION

The Motions to Dismiss will be granted. As against Nautilus, all claims—Counts I through V—will be dismissed. Both Nautlius and Industrial Demolition will be terminated as parties. As against AXIS, the declaratory judgment, bad-faith, and vexatious-refusal claims—Counts I, IV, and V—will be dismissed as well. The sole live claim will be Count III, EnviroAnalytics' breach-of-contract (duty to indemnify) claim, against AXIS. To the extent that EnviroAnalytics seeks declaratory relief on that claim, the request will be dismissed without prejudice.

DATED this _13_ day of May, 2025.

BY THE COURT:

James K. Bredar
United States District Judge