## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ENVIROANALYTICS
GROUP LLC, *et al.*,

    **Plaintiffs,**

    **v.**

AXIS SURPLUS INSURANCE
COMPANY, *et al.*,

    **Defendants.**

\* \* \* \* \* \* \* \* \* \* \* \*

Civ. No. JKB-24-2970

### MEMORANDUM

Before the Court is Plaintiff Industrial Demolition LLC's Motion for Reconsideration. (ECF No. 40.) Industrial Demolition seeks to reinstate four of its five claims that were dismissed in the Court's Memorandum and Order dated May 13, 2025 (ECF Nos. 35 and 36, respectively).[1] (*Id.* at 3, 18.) In the alternative, it seeks leave to amend its complaint to include additional allegations and documents integral to those claims. (*Id.* at 9 n.3, 18.) The motion is fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2025).

For the reasons below, the motion will be denied in part and granted in part. It will be denied insofar as it seeks reconsideration of the Court's earlier ruling. But it will be granted insofar as it seeks leave to amend.

## I.    BACKGROUND

This case involves a coverage dispute between two insureds and their respective insurers. The facts and procedural history are set out in detail in the Court's May 13 decision. *See* (ECF

---

[1] An unsealed version of the Memorandum is docketed as ECF No. 39. *See generally EnviroAnalytics Group LLC v. AXIS Surplus Ins. Co.*, --- F. Supp. 3d ---, 2025 WL 1475447 (D. Md. 2025).

No. 39 at 3–9), *reproduced as EnviroAnalytics Group LLC v. AXIS Surplus Ins. Co.*, --- F. Supp. 3d ---, 2025 WL 1475447, at *1–5 (D. Md. 2025). As relevant here, Industrial Demolition—an environmental remediation and demolition firm—sued Defendant Nautilus Insurance Company for failing to defend and indemnify Industrial Demolition in an earlier lawsuit. *EnviroAnalytics*, 2025 WL 1475447, at *4. That earlier litigation concerned, among other things, Industrial Demolition's allegedly improper and/or deficient work as a subcontractor on the redevelopment of a site of a former Baltimore-area steel plant. *See id.* at *2, 12–14. After Nautilus refused to assist Industrial Demolition in that underlying action, Industrial Demolition sued. *Id.* at *4. It sought both contract damages (in the form of litigation and settlement costs Industrial Demolition said Nautilus should have paid) and auxiliary tort damages (for what Industrial Demolition viewed as Nautilus's unreasonable position). *See id.*

In its May 13 decision, the Court granted Nautilus's motion to dismiss each of Industrial Demolition's five claims. *EnviroAnalytics*, 2025 WL 1475447, at *29. The four claims Industrial Demolition now seeks to reinstate—Counts II through V—were dismissed because, in the Court's view, they depended on coverage that Industrial Demolition's insurance policy with Nautilus did not provide. *See id.* at *9. Because there was no coverage, Nautilus had no duty to defend or pay for the earlier litigation, and Industrial Demolition had no right to any damages flowing from Nautilus's decision not to participate. *See id.* at *9, 14–20.

Although Industrial Demolition previously asserted three putative grounds for coverage, it now attacks the Court's reasoning on just one: the professional liability coverage. (*See* ECF No. 40 at 3.) In relevant part, that coverage obliged Nautilus to "pay those sums that [Industrial Demolition] becomes legally obligated to pay as damages . . . that result from professional services to which this insurance applies." *EnviroAnalytics*, 2025 WL 1475447, at *12 (quoting ECF No.

1-2 at 18). Industrial Demolition argues the Court used the wrong definition of "professional services"—first by crediting an interpretation that Nautilus improperly advanced for the first time in a reply brief, then by adopting that definition despite its inconsistency with the plain language of the contract. (ECF No. 40 at 3.) It adds that, even if the Court's definition were correct, the Court erred in holding that the underlying lawsuit had nothing to do with any "professional services" so defined (and thus triggered no duties on the part of Nautilus). (*Id.*)

It is on primarily these grounds that Industrial Demolition asks the Court to reconsider its decision. In the alternative, Industrial Demolition seeks leave to amend its complaint, on the view that additional allegations and documents—in particular, the underlying contract that defined the scope of its work on the redevelopment project—will reveal that Nautilus should have known Industrial Demolition was being sued for covered "professional services."[2]

---

[2] There is one other ground for reconsideration Industrial Demolition puts forward: a purported error in the Court's choice to apply, in this case, a specific principle of Missouri insurance law. (*See* ECF No. 40 at 15–18.) The Court addresses that ground here.

    To understand this argument, some background is in order. Alongside their breach-of-contract claims, Industrial Demolition and its co-plaintiff sued their insurers for two kinds of insurance tort: (1) bad-faith failure to settle, which arises under the common law, and (2) vexatious refusal to pay, which is a creation of Missouri statute. *See EnviroAnalytics*, 2025 WL 1475447, at *4. The Court held that, under Missouri law, the statutory tort preempts the common-law one, at least in the context of first-party insurance claims. *Id.* at *25. In its motion for reconsideration, Industrial Demolition argues this observation was irrelevant and erroneously applied to this dispute, as this case involves third-party claims, not first-party claims. (ECF No. 40 at 15–16.) It also takes issue with the Court's characterization of first-party claims as those "made by an insured against its own insurer." (*Id.* at 16 (quoting *EnviroAnalytics*, 2025 WL 1475447, at *25).)

    The Court acknowledges the point, and it concludes that Industrial Demolition may well be correct that the Court was wrong to apply the preemption principle on the facts of this case. But that is no reason to reconsider Industrial Demolition's dismissal. The Court discussed the preemption principle only in the context of claims brought by Industrial Demolition's co-plaintiff. *See EnviroAnalytics*, 2025 WL 1475447, at *24–25 & n.27. In other words, the principle was never applied to Industrial Demolition's claims, which the Court held defective on a wholly distinct—and analytically prior—ground: a lack of coverage under the relevant policy, based on the materials that were before the Court at the time. *Id.* at *9. The Court reaffirms that holding today. Because no other party has raised the issue, much less briefed it, the Court goes no further.

## II.    LEGAL STANDARDS

### A.    Motions to Reconsider

Motions to reconsider are governed by different standards at different stages of litigation. For interlocutory orders, Federal Rule of Civil Procedure 54(b) applies. Under that Rule, any order that adjudicates a subset of a case "may be revised at any time" before final judgment on all claims. Fed. R. Civ. P. 54(b). But a court should exercise that discretion under only those circumstances "in which it [would] depart from the law of the case: (1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice." *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (cleaned up). When a request for interlocutory reconsideration rests on the third ground, a purported error in the court's legal analysis, the standard "closely resembles" that for motions to reconsider final orders under Rule 59(e). *See id.* (citation omitted).

Rules 59(e) and 60(b) govern reconsideration after final judgment has been entered. These standards are "strict." *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003). Under Rule 59(e), a court may amend a judgment only "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993) (citations omitted). And under Rule 60(b), a court may grant relief from a judgment only for "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud or misconduct by the opposing party; (4) voidness; (5) satisfaction; or (6) any other reason that justifies relief." *Butler v. DirectSAT USA, LLC*, 307 F.R.D. 445, 449 (D. Md. 2015).

The standard for reconsideration based on legal error differs between the two post-judgment rules. *Spitalnick v. King & Spalding, LLP*, Civ. No. JKB-24-1367, 2025 WL 1474835,

4

at *2 (D. Md. May 22, 2025). "Under Rule 59, a decision must amount to a clear error causing manifest injustice, which it cannot do 'by being just maybe or probably wrong'; instead, 'it must strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong.'" *Id.* at *2 (quoting *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 258 (4th Cir. 2018)). But under Rule 60, "the standard appears to be lower, requiring only that there be a 'mistake'—obvious or not." *Id.* (citing *Kemp v. United States*, 596 U.S. 528, 535–36 (2022)).

### B.    Motions for Leave to Amend

Prior to a court-ordered deadline for amendment of pleadings, *see generally* Fed. R. Civ. P. 16(b)(3)(A), leave to amend is governed by Federal Rule of Civil Procedure 15. *See Valentine v. Monahan*, --- F. Supp. 3d ---, 2025 WL 1446622, at *3–4 (D. Md. 2025); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). At the very earliest stages of litigation, a party may amend once as a matter of course. *See* Fed. R. Civ. P. 15(a)(1). Otherwise, without the opposing party's written consent, amendment is permitted only with the court's leave. Fed. R. Civ. P. 15(a)(2). Under Rule 15, courts adhere to the "relatively generous" practice of "freely giv[ing] leave when justice so requires." *Rouse v. Fader*, 758 F. Supp. 3d 397, 403 (D. Md. 2024) (quoting Fed. R. Civ. P. 15(a)(2)). Leave to amend is denied "only when the amendment would be prejudicial to [an] opposing party, there has been bad faith on the part of the moving party, or the amendment would [be] futile." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (ultimately citing *Foman v. Davis*, 317 U.S. 178, 182 (1942)). Within those constraints, a court retains broad discretion to deny a request "so long as it does not outright refuse 'to grant the leave without any justifying reason.'" *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010) (quoting *Foman*, 371 U.S. at 182).

## III.    ANALYSIS

Because the Court did not err in its earlier analysis of Industrial Demolition's claims, the motion for reconsideration will be denied. The request for leave to amend will be granted, however, as the Court is unable to conclude that the proposed additional document and related allegations offer no plausible pathway to relief.

### A.    Because the Court Did Not Err in Its Analysis of Industrial Demolition's Claims, Industrial Demolition's Motion for Reconsideration Will Be Denied.

The Court did not err in its analysis of Industrial Demolition's claims. In deciding that Nautilus's coverage did not reach the events at issue in the underlying litigation, the Court applied the definition of "professional services" set out in the parties' insurance contract. And it properly held that the underlying pleadings had nothing to do with any "professional services" so defined. Because the Court reached the correct conclusion under the law, it need not decide which of the three standards for reconsideration based on legal error—those of Rule 54(b), 59(e), or 60(b)—is appropriately applied in the context of Industrial Demolition's total dismissal from an otherwise live case.

### 1.    The Court Applied the Correct Definition of "Professional Services."

Industrial Demolition argues that the Court adopted an interpretive "approach" advanced for the first time in Nautilus's reply brief. (*See* ECF No. 40 at 5.) Because of that, it says, the definition of "professional services" the Court adopted was one extrinsic to the parties' contract, notwithstanding the agreement's express and unambiguous definition of the term. (*See id.* at 4– 5.) The Court considers these contentions below.

          *i.*    *Nautilus Did Not Advance a New Interpretive "Approach" in Its*
                *Reply Brief.*

In its initial motion, Nautilus quoted the relevant contractual language, including the definition of "professional services." (*See* ECF No. 26-1 at 6–7.) It then argued that "[n]owhere does the [underlying complaint] allege that [Industrial Demolition] performed services" in line with that definition, stating that underlying complaint "allege[d] only that [Industrial Demolition] was performing dredging work . . . under the oversight of" its co-plaintiff. (*Id.* at 16.) Industrial Demolition responded that the Court needed to construe the definition of "professional services" by looking to the ordinary meanings of the definition's individual words and terms. (*See* ECF No. 28 at 10–11.) It then cited various extrinsic sources, including two dictionary definitions and a Fourth Circuit case, as evidence of those meanings. (*See id.* at 11.) In reply, Nautilus referred to an Eighth Circuit case, already cited by Industrial Demolition for a different proposition, that defined the phrase "professional services" as a whole, rather than defining the individual words and terms of the contract definition. (ECF No. 33 at 5.)

Nautilus's reply hardly constituted a new "approach." Nautilus used a single outside authority—again, a case that Industrial Demolition had already cited—to respond to the theory Industrial Demolition advanced in its response brief as to the meaning of "professional services." (ECF No. 33 at 5.) Even if looking to outside uses of "professional services" were incorrect as a matter of contract law (a position the Court rejects, *see infra* Section III.A.1.ii), doing so here did not amount to a new or unforeseeable argument. If Industrial Demolition truly believed it was the victim of an analytical sucker punch, it should have sought leave to file a surreply. But it did not— a choice it now defends by citing the Local Rule that, "[u]nless otherwise ordered by the Court, surreply memoranda are not permitted to be filed." (ECF No. 40 at 3 (quoting Local Rule 105.2 (D. Md. 2023)).) Disfavored or not, surreply relief is available, in appropriate circumstances, to

those who seek it. Although the Court likely would not have granted the request in this instance, it is even less sympathetic to the suggestion at this late stage.

> ii. *The Court's Definition of "Professional Services" Was the One Set Out in the Contract Itself.*

Under Missouri law, "[i]f the language in an insurance contract is clear and unambiguous, [a court] must construe the contract as written." *Gavan v. Bituminous Cas. Corp.*, 242 S.W.3d 718, 720 (Mo. 2008) (citation omitted). That requires courts to give terms "their plain and ordinary meaning unless it is clear from the policy that the parties intended an alternate meaning." *Id.* (citation omitted). "An insurance policy, being a contract designated to furnish protection, will, if reasonably possible, be construed so as to accomplish that object and not to defeat it." *Burns v. Smith*, 303 S.W.3d 505, 512 (Mo. 2010) (citation omitted).

Here, the professional liability coverage obliged Nautilus to "pay those sums that [Industrial Demolition] becomes legally obligated to pay as damages . . . that result from professional services to which this insurance applies." *EnviroAnalytics*, 2025 WL 1475447, at *12 (quoting ECF No. 1-2 at 18). To be covered, damages "must [have] result[ed] from an actual or alleged act, error or omission in [Industrial Demolition's] performance of professional services." *Id.* (quoting ECF No. 1-2 at 18.) "Professional services" refers to "those services performed by [Industrial Demolition] or on [its] behalf, that are related to [its] practice as an engineer, consultant, architect, or surveyor that are performed for others for a fee." *Id.* (quoting ECF No. 1-2 at 36).

In its earlier opinion, the Court reproduced the contractual definition of "professional services," then described a series of cases and authorities discussing it and similar terms. *See EnviroAnalytics*, 2025 WL 1475447, at *12, 18. The Court ultimately held that covered "professional services" were "only those acts committed while practicing engineering." *See id.* at *18. Industrial Demolition says the Court erred by looking to outside authorities to define the term

"professional services" (as opposed to any subsidiary words and terms), and argues that if it had not, it would have adopted what Industrial Demolition considers to be the meaning of the contract "as written": acts "that are related to the practice of an engineer." (*See* ECF No. 40 at 7 (internal quotation marks omitted).)

The definition the Court adopted was the definition set out in the contract "as written." *Gavan*, 242 S.W.3d at 720. The listed occupations make clear that coverage reaches insureds acting only in the course of their learned professions. (*See* ECF No. 1-2 at 36.) Because that meaning is patent, there is no ambiguity in the contract, and therefore no need to look outside it to determine its meaning. *See Gavan*, 242 S.W.3d at 720. On this point, the Court agrees with Industrial Demolition, albeit to an opposite end (no coverage under the policy).

Even if there is no reason to look beyond the contract as an interpretive matter, a court may still avail itself of extrinsic sources for certain, limited purposes. An outside source may, for example, describe an identical concept in language the reviewing court finds helpful. So long as the court comes by and applies its definition in a manner faithful to the instrument being construed, it is not error to clothe that definition in the vernacular of another decision. And that is precisely what the Court did in its prior ruling—specifically, in describing a "professional act" as one rooted in "a vocation, calling, occupation or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual rather than physical or manual." *EnviroAnalytics*, 2025 WL 1475447, at *18 (quoting *Shelter Ins. Cos. v. Hildreth*, 255 F.3d 921, 925 (8th Cir. 2001)). Restating the contract definition using the language of other authorities hardly means the Court derived that definition from outside the four corners of the contract.

Industrial Demolition's alternative meaning of "professional services"—anything "connected with" "the practice of an engineer," (*see* ECF No. 40 at 7–8 (cleaned up))—buckles under its own weight. Industrial Demolition argues that this definition flows naturally from the policy's use of the term "related to." (*Id.*) But as this Court recently explained,

> such a broad term cannot be unlimited in scope. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes it would never run its course, for really, universally, relations stop nowhere." (cleaned up)). The term "refers to a relationship or nexus of some kind" and "its nature and strength will be informed by context." *Dubin v. United States*, 599 U.S. 110, 119 (2023).

*United States v. Costianes*, --- F. Supp. 3d ---, 2025 WL 1358352, at *6 (D. Md. May 9, 2025) (cleaned up). Here, judicial common sense must temper the hyperliteral meaning of "related to" that Industrial Demolition puts forward, whatever that meaning's accuracy in a vacuum. Otherwise, the policy would reach nonprofessional acts committed by nonprofessional employees, so long as there was some link, however tenuous, to engineering work. That view is at odds with an agreement designed to protect an insured in the exercise of learned professions, (*see* ECF No. 1-2 at 36), and, indeed, with the very purpose of professional liability coverage. The Court will not construe this policy in that fashion. *See Gavan*, 242 S.W.3d at 720 (explaining that courts "give terms their plain and ordinary meaning *unless it is clear from the policy that the parties intended an alternate meaning*" (emphasis added) (citation omitted)). It continues to conclude that the "nature and strength" of "related to" in this case entails that Industrial Demolition was covered only if it "was using 'specialized knowledge, labor, or skill[s]' associated with the engineering profession, and that it was doing so in a 'predominantly mental or intellectual' manner." *EnviroAnalytics*, 2025 WL 1475447, at *19 (quoting *Hildreth*, 255 F.3d at 925).

2.    Under the Correct Definition of "Professional Services," the Underlying Lawsuit Did Not Trigger Coverage.

In its earlier ruling, the Court catalogued the underlying allegations about Industrial Demolition's dredging, then held that these allegations did not show Industrial Demolition to have been engaged in covered "professional services." *See EnviroAnalytics*, 2025 WL 1475447, at *12– 13, 19. Industrial Demolition argues that this "reflects a fundamental misunderstanding of the sophisticated nature of environmental dredging work and the specialized knowledge, education, and training it requires." (ECF No. 40 at 10.)

This argument is unavailing. The Court did not hold that dredging could never be a "professional service" within the scope of the insurance policy. It held only that not all acts of dredging fit that description. *See EnviroAnalytics*, 2025 WL 1475447, at *19. For that reason, Industrial Demolition's appeals to situations in which dredging *could* be an act of engineering, (*see* ECF No. 40 at 10–11), are beside the point. The problem for Industrial Demolition was, and remains, that the underlying complaint did not show it to have been engaged in the "predominantly mental or intellectual" kind of dredging work characteristic of a "professional service." *See EnviroAnalytics*, 2025 WL 1475447, at *19. Rather, "to the extent the allegations discuss[ed] Industrial Demolition's role at all, they reveal[ed] it to be a basically physical one (digging and hauling)"—the work of an implementer, not a planner. *See id.* Whether or not that would be enough to trigger coverage under Industrial Demolition's preferred interpretation of the policy, *see supra* Section III.A.1.ii, it was not enough to trigger coverage under the correct one.

Industrial Demolition also argues that, even if coverage were not triggered by the allegations of the underlying pleadings, it should have been triggered by the dredging contract mentioned therein. (*See* ECF No. 40 at 9 & n.3, 11–12 & n.4.) There is some validity to this. After all, an insurer's duties attach based on "the totality of a case—its allegations, the substance

11

of its legal theories, and any other learnable facts." *EnviroAnalytics*, 2025 WL 1475447, at \*12 (citations omitted). That means that if Nautilus could have learned of the dredging contract through reasonable diligence, the substance of that agreement should have informed Nautilus's inquiry into whether the underlying suit pressed "a claim [actually or] potentially within the policy's coverage." *See id.* at \*12, 15 (quoting *Allen v. Bryers*, 512 S.W.3d 17, 31 (Mo. 2016)).

But that is still no reason for the Court to reconsider its prior ruling. Until Industrial Demolition's motion for reconsideration, the dredging contract was not before the Court. *See EnviroAnalytics*, 2025 WL 1475447, at \*14 (explaining that "Industrial Demolition never allege[d] that relevant facts existed outside the [underlying] pleadings, much less that Nautilus failed to exercise reasonable diligence in ascertaining them"). It is irrelevant, then, whether the contract was incorporated by reference into the underlying complaint (and, by extension, into the pleadings in this case), such that it *could* have been considered without converting the motion to dismiss into one for summary judgment. (*See* ECF No. 40 at 9 n.3.) If Industrial Demolition had wanted the Court to consider the contract, it needed to submit the contract as an exhibit. And to the extent it did not see any need to attach the contract until after Nautilus's reply brief, (*see id.* at 9–10), the Court observes, again, that it could have sought leave to file a surreply. *See supra* Section III.A.1.i. Whether Industrial Demolition should now be granted leave to file the exhibit as an amendment to its pleadings is addressed below.[3]

---

[3] The Court does not address Industrial Demolition's contention that the underlying claims are not subject to the policy's various exclusions. (ECF No. 40 at 12–15.) While Nautilus made the opposite argument in its motion to dismiss, (*see* ECF No. 26-1 at 16), the Court found it unnecessary to consider the point earlier, given what the Court held to be a lack of coverage on the face of the policy. *EnviroAnalytics*, 2025 WL 1475447, at \*20 n.21. Nautilus expressly declined to readdress the issue in the current posture. (ECF No. 41 at 4 n.2.)

**B.    Industrial Demolition's Request for Leave to Amend Its Complaint Will Be Granted.**

Industrial Demolition seeks leave to amend its complaint to add the contract for the dredging work that was at issue in the underlying litigation, along with relevant allegations. (ECF No. 40 at 9 n.3, 18; *see generally* ECF No. 40-1.) That request will be granted.

As explained above, when an insured is sued, the insurer's duties attach based on "the totality of a case—its allegations, the substance of its legal theories, and any other learnable facts." *EnviroAnalytics*, 2025 WL 1475447, at *12 (citations omitted). It is at least plausible that Industrial Demolition's dredging contract would have been discovered and considered upon a reasonable investigation by Nautilus, particularly given that the contract was mentioned (under the title of "master services agreement") in the underlying complaint. (*See* ECF No. 1-3 at 17.) To the extent that contract raised the possibility· that, regardless of the underlying allegations, Industrial Demolition *had* been engaged in covered "professional services," Nautilus would have had (at least) a duty to defend in the underlying litigation. *See Bryers*, 512 S.W.3d at 31.

For the same reasons the Court held the underlying allegations insufficient to trigger Industrial Demolition's professional liability coverage, the Court is highly skeptical that the dredging contract shows that Industrial Demolition was, on this redevelopment project, engaged in covered "professional services." *Cf. EnviroAnalytics*, 2025 WL 1475447, at *19. Industrial Demolition's specific duties are set out in the contract's scope-of-work addendum. (*See* ECF No. 40-1 at 7–8.) These duties include "[s]et[ting] up [a] job site trailer," "[p]repar[ing] specified staging areas to store stone and other necessary materials," "[g]rub[bing] and clear[ing] all vegetation within [the] work area," "[c]onstruct[ing] dewatering pad for excavated sediments," "[e]xcavati[ng] . . . sediment," and more. (*Id.*) These tasks often come with even more detailed sub-instructions, such as "[w]oody and fibrous vegetation should be ground up using wither a tub

[*sic*] or horizontal grinder," "[s]tockpile should be covered with a tarp," and "[p]lace 8 once non-woven geotextile fabric within excavated section." (*Id.*) The nature of these tasks, as well as the level of detail with which they are described, leave the Court the same basic impression it had of the underlying allegations: it was Industrial Demolition's co-plaintiff "that was hired for its professional services, while Industrial Demolition was hired solely to 'implement' the 'various dredging, maintenance, and site cleanup' plans that [the co-plaintiff] had devised." *EnviroAnalytics*, 2025 WL 1475447, at *19.

Nevertheless, leave to amend prior to the amendment deadline is granted under the forgiving standard of "when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). And while the Court is confident that many tasks, like "[r]emoving sections of guard rail" and "cover[ing] [material] with a tarp," are not "professional services" within the meaning of the insurance policy, other tasks, like "[i]nstall[ing] coffer dam" and "[c]omplet[ing] all dewatering," are less clear. (*See* ECF No. 40-1 at 7.) So, despite its doubts, the Court is unable to conclude that amending the complaint to include the dredging contract and any pertinent allegations offers no plausible pathway to relief. *See In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021) (explaining that, when an amendment is not "clearly insufficient or frivolous on its face," courts may analyze its futility under the Rule 12(b)(6) standard). While Nautilus insists otherwise, its support for that position consists of only the unadorned statement that "nothing in the document . . . would bring the underlying matter within the coverage of the [policy]." (ECF No. 41 at 10.) Construing the document in the light most favorable to Industrial Demolition, Industrial Demolition may (with the aid of additional facts) be able to show that the described activities raised at least a possibility,

if not the reality, of coverage. At this stage, that is enough for a claim based on an insurer's duty to defend.[4] *See EnviroAnalytics*, 2025 WL 1475447, at *11 & n.16, 15. Leave will be granted.

## IV.    CONCLUSION

For the reasons above, Industrial Demolition's request for reconsideration will be denied. Leave to amend will be granted to allow Industrial Demolition to attach the dredging contract, docketed as ECF No. 40-1, and to offer additional allegations about that document. This exhibit and any accompanying allegations will be permitted only as relevant to the issue of professional liability coverage (as opposed to any other coverages).

DATED this __3__ day of July, 2025.

BY THE COURT:

_James K. Bredar_

James K. Bredar
United States District Judge

---

[4] The Court takes no position on how such an addition would affect Industrial Demolition's duty-to-indemnify or auxiliary tort claims. *See EnviroAnalytics*, 2025 WL 1475447, at *14–15 (dismissing those claims solely because Industrial Demolition had, at that time, not plausibly stated the even more permissive duty-to-defend claim).